CHAMPLIN'S REALTY ASSOCIATES

v.

Michael TIKOIAN et al.

Town of New Shoreham

v.

Coastal Resources Management Council.

Nos. 2009–113–M.P., 2009–114–M.P., 2009–115–M.P.

Supreme Court of Rhode Island.

Feb. 18, 2010.

R. Daniel Prentiss, Esq., Marc DeSisto, Esq., Brian A. Goldman, Esq., Providence, Jerry Elmer, Esq., for Petitioners.

Kathleen Managhan, Esq., Newport, for Respondents.

Present: SUTTELL, C.J.,
FLAHERTY, ROBINSON, JJ., and
WILLIAMS, C.J. (ret.).

## OPINION

Justice FLAHERTY, for the Court.

Block Island sits approximately twelve miles off the coast of Rhode Island. Sometimes referred to as the "Bermuda of the North," it is a place of spectacular beauty. For generations, vacationers have flocked to the island during the short summer months to relax and enjoy the beaches and unspoiled vistas that nature has provided. Although the island is home to a small airport, the vast majority of visitors arrive by boat—including regular ferry service and private vessels. As is the case in many coastal communities, dock and mooring space can be at a premium.

Champlin's Realty Associates (Champlin's) operates a large marina on Block Island serving the needs of boaters and their craft. Concerned that it lacked the space to meet its business demands, Champlin's filed an application to expand its operation to a substantial degree. The dispute over that proposed expansion, involving Champlin's, the Coastal Resources Management Council (CRMC or council), the Town of New Shoreham[1] (town), and a number of intervening environmental groups, has finally wended its way to this Court. After carefully reviewing the record, we affirm the judgment of the Superior Court in part, reverse in part, and remand to the Superior Court with instructions that it remand this matter to the CRMC for further proceedings consistent with this opinion.

---

1. New Shoreham is the only municipality on Block Island.

2. The CRMC is authorized to appoint a hearing officer, but the CRMC chairman is also authorized to designate a subcommittee to

## I

### Factual Background

The CRMC is a state agency charged with protecting and regulating Rhode Island's coastal resources. General Laws 1956 § 46–23–l(b)(1). Champlin's Realty Associates, a Rhode Island corporation, filed an application with the CRMC to extend its existing marina 240 feet into the Great Salt Pond in the Town of New Shoreham to accommodate 140 additional boats. The proposed expansion included 2,990 feet of fixed pier and an additional 755 feet of floating docks. Under the proposal, the additional dockage would extend from the existing marina. The CRMC has the statutory authority to grant applications for such expansions of existing marinas. Section 46–23–6(4)(iii).

The Town of New Shoreham and intervenors, the Block Island Land Trust, the Conservation Law Foundation, the Committee for the Great Salt Pond, and the Block Island Conservancy, opposed the application. When the CRMC receives a written objection to an application, the proceeding then becomes "contested" under the CRMC Management Procedures. The CRMC Management Procedures further provide that such contested cases be the subject of a public hearing before a "duly authorized and appointed Subcommittee."[2] Pursuant to his authority and in accordance with the relevant CRMC Management Procedures, the CRMC chairman Michael Tikoian appointed a subcommittee composed of five members: Jerry Sahagian, Thomas Ricci, Gerald P. Zarrella, and Paul E. Lemont as chairman.[3]

---

"act as hearing officers in any contested case" if the hearing officers "are otherwise engaged and unable to hear the matter in a timely fashion." G.L.1956 § 46–23–20.1(e).

## A

### Subcommittee Hearings

The subcommittee held twenty-three public hearings over the course of two years from the time of Champlin's application in 2003 until its final hearing on September 16, 2005. Extensive testimony and voluminous exhibits were received during the hearings, which reportedly were the longest and most exhaustive in CRMC history. The protracted hearings were rancorous and hotly disputed, not only among the parties but also among the subcommittee members. Subsequently, the four subcommittee members eligible to vote held a public workshop on October 24, 2005, to make findings of fact based on the evidence that had been presented to them, and to decide upon the recommendation that the subcommittee would make to the full CRMC. Subcommittee member Ricci commented during the public workshop that "clearly, this is an emotional, very difficult issue." Subcommittee member Zarrella asserted at the public workshop: "I wish Mike Tikoian never put me on this committee, 23 meetings. * * * I don't want to be here." It was clear that tension arose in this case because of a conflict involving the implications of the marina expansion into the environmentally sensitive Great Salt Pond and the reality that dockage for watercraft is necessary for the general public to have access to the island.

As chairman of the subcommittee, Lemont addressed those present at the workshop and praised "both sides" for their "outstanding presentation." He noted that after looking at the evidence, "there is no right and there is no wrong. * * * We're looking at what is the best fitted decision that will impact all of the concerns raised." Lemont expressed his conclusion that "[t]here has to be compromise," and he supported neither the grant of the full application nor its outright denial. He was not alone; during the public workshop, all four members of the subcommittee voiced their opinions against the full requested expansion in the application, and three members, Chairman Lemont excluded, indicated that they would support a middle ground of an expansion of 170 feet.

Lemont stated at the public workshop that he would "not support anything more than 100 feet." Sahagian expressed his wish that "the Town or the objectors did try to compromise a little bit more." He went on to say that "what I am thinking right now is the Town at one point was at 100 feet, the applicant was at 240. [One-hundred and seventy feet] is in the middle." Ricci commented, "I am not in favor of approving the application as it's stated, for 240 feet. But, I also agree with my fellow subcommittee members, that I'm not in favor of denying the application outright." He concluded that "[t]he applicant seeks 240 feet. They're not going to get my recommendation for that or my vote for that." Zarrella remarked that he "wished [the town] left that plan in there for 100 feet. It would have been a lot * * * easier if [they] left the plan there, but when they took it out at the public meeting, it's been difficult for me." He went on to say, "I can't say no expansion. I can't say it. The evidence is not there. The evidence is there for expansion. And, I can't say 240 feet." Further, Zarrella concluded that "I'm on the page that the Chairman is, of a compromise, but I think [that] I'm on a page that I'm a little bit more—I want to give a little bit more." He lamented, "[the] Town's hands are tied.

---

**3.** Tikoian also appointed Senator Susan Sosnowski, but she did not participate in the subcommittee's hearings or its recommendation.

The plans for 100 feet came in too late. As far as I was concerned, it should have come in earlier and I think you guys could have negotiated it out a long time ago."

On January 10, 2006, the subcommittee made forty-seven findings of fact and issued a recommendation with the three votes in favor of a scaled-down modification of the proposal to 170 feet, rather than 240 feet, and one vote, Lemont, against.

## B

### Full Council Hearing

On February 28, 2006, the CRMC met in accordance with § 46–23–20.4(a) and the CRMC Management Procedures 5.3(2) and 5.3(3) to consider the record, evidence, and the subcommittee's recommendation, as well as Champlin's argument that the CRMC should adopt the recommendation. The CRMC is vested with the authority, in its discretion, to adopt, modify or reject the subcommittee recommendation, findings of fact, and conclusions of law if the rationale for doing so is provided in writing. Section 46–23–20.4(a). However, before it could take up the subcommittee recommendation, the CRMC first addressed Champlin's previously filed motions to disqualify both Tikoian and member David Abedon from participating on the basis of public statements made by them after the vote of the subcommittee. After denying those motions, the CRMC proceeded to consider the subcommittee's recommendation. The transcript reveals that the meeting, like the subcommittee proceedings that preceded it, was rife with tension.

Ultimately, five members of the full council, including Zarrella, voted to approve the subcommittee's recommendation, while five members, including Lemont and Tikoian, voted against adoption. The resulting tie vote constituted a rejection of the recommendation. On July 5, 2006, the CRMC issued its written decision denying Champlin's application. That same day, the five members who voted in favor of adopting the subcommittee's recommendation released "Findings of Fact of the CRMC Members in Support of the Subcommittee Recommendation."

## II

### Procedural Background

#### A

##### Administrative Appeal

In the midst of an atmosphere of hostility and tension, an appeal to the Superior Court ensued. The Superior Court has jurisdiction to hear appeals from administrative agencies such as the CRMC under the Rhode Island Administrative Procedures Act, G.L.1956 § 42–35–15. On March 23, 2006, Champlin's filed a complaint in the Superior Court, in which it sought judicial review of the CRMC's decision rejecting its application.[4] In count 1 of its complaint, Champlin's asserted that when the CRMC rejected the subcommittee recommendation and denied its application for expansion the agency (1) affected Champlin's substantial rights in violation of constitutional or statutory procedure; (2) acted in excess of its statutory authority; (3) made use of unlawful procedure; (4) made a decision that was affected by other error of law, and was arbi-

---

4. The town also brought an administrative appeal from the failure of the CRMC to approve the Harbor Management Plan submitted in 1999. This appeal was consolidated with Champlin's appeal. The trial justice dismissed the town's appeal without prejudice on the grounds that the town did not have standing under G.L.1956 § 42–35–15. This ruling has not been appealed to this Court.

trary, capricious, and characterized by abuse of discretion or clearly unwarranted exercise of discretion. In count 2, Champlin's alleged that the refusal to disqualify Tikoian and Abedon violated Champlin's right to procedural and substantive due process under the Constitution and laws of Rhode Island, the Constitution of the United States, and the CRMC management practices. In count 3, Champlin's averred that Tikoian and Abedon should have recused themselves from considering Champlin's application.

As a remedy, Champlin's requested that the Superior Court rule that the vote taken with Tikoian's and Abedon's participation was void and that it remand the matter to the CRMC with directions to approve the subcommittee's recommendation and order Tikoian and Abedon to cease participation in proceedings regarding Champlin's application. Also, after extensive evidentiary hearings before the Superior Court, Champlin's moved to disqualify Tikoian, Lemont, and members Gray, Sullivan, Gomez, and Dawson from further participation in the application should it be remanded to the CRMC. Champlin's also moved to disqualify the votes of Tikoian, Lemont, Gray, and Sullivan from the CRMC vote taken on February 28, 2006.

## B

### Evidentiary Hearing

Pursuant to § 42–35–15(f), Champlin's filed a motion requesting an evidentiary hearing before the trial justice to determine the existence of any procedural irregularities during the course of the CRMC proceedings.[5] The CRMC objected to the

motion for an evidentiary hearing arguing, *inter alia,* that the evidentiary hearing inevitably would intrude on the mental processes of the agency members as they formulated their opinions, recommendations, and evaluations in violation of quasi-judicial immunity. Even though she granted the motion for an evidentiary hearing, the trial justice assured the parties that "I don't expect to have council members queried on their mental processes, their mental impressions. I will look at whether or not there were outside influences and improper influences that got in it, and those improper influences in and of themselves may or may not give rise to a court decision that they infected whatever determination that the council made." As a result of the trial justice's ruling, there followed sixteen hearings from March 19, 2007, until April 13, 2007.

### i

### *Arnold* Show–Cause Hearing

Also, it is significant that on January 2, 2008, after the hearings before her were concluded and after this Court issued *Arnold v. Lebel,* 941 A.2d 813 (R.I.2007), a case that proscribed *ex parte* contacts at the agency level, the trial justice issued a show-cause order that asked the parties to "show cause why Plaintiff's appeal should not be granted" based on the likelihood that *Arnold* "prohibit[ed] the type of off the record communications" revealed by the evidentiary hearing. The show-cause hearing was held on January 23, 2008. At that hearing, the intervenors requested the opportunity to present evidence concerning the potential disqualification of subcommittee member Zarrella. The trial justice allowed the intervenors to proffer

5. Section 42–35–15(f) provides:
 "The review shall be conducted by the court without a jury and shall be confined to the record. In cases of alleged irregularities in procedure before the agency, not shown in the record, proof thereon may be taken in court. The court, upon request, shall hear oral argument and receive written briefs."

evidence supporting the disqualification of both Zarrella and Sahagian, as well as the propriety of reopening the evidentiary hearing. After considering the intervenors' arguments, the trial justice permitted a limited hearing as to Zarrella. That hearing was held on April 9, 2008.

## ii

### Trial Court's Findings

The trial justice made extensive factual findings and credibility determinations regarding the testimony of the witnesses during the sixteen evidentiary hearings, the show-cause hearing, and the hearing regarding Zarrella. The trial court concluded, based on the testimony, that the CRMC members "did not appreciate the quasi-judicial nature of their roles or the prohibition against ex parte communications." Specifically, the trial justice found that Tikoian demonstrated his prejudgment of the application through numerous *ex parte* contacts. Similarly, the trial justice found that Lemont also revealed his preconceived opinion and resultant bias at the evidentiary hearings because of his comments about his unwavering support for a "compromise plan." The trial justice also found that Zarrella "failed to appreciate the quasi-judicial nature of his role," based on statements he made to town officials and his remarks before the full council. As a result, the trial justice found that due to their bias, Lemont and Zarrella should have been disqualified from participating in the workshop and that the two of them, as well as Tikoian, should not have taken part in the CRMC decision.

The trial justice also found that Tikoian and Lemont wrongfully collaborated to produce a compromise plan after the subcommittee hearings were completed and that they "made no secret" about their opposition to the application as filed. She found that Lemont requested that Grover Fugate, executive director of the CRMC, create an alternate plan and that Fugate in turn had asked Dan Goulet, a staff engineer, to prepare this plan. The resultant plan, the "Goulet plan," proposed a compromise of sorts that would extend the marina by 100 feet to the west. Goulet testified at the evidentiary hearing that he reviewed information that was not included in the record of the subcommittee proceedings when he created the alternate plan. As a result, the parties and intervenors were deprived of the opportunity to cross-examine Goulet about the alternate plan during the CRMC proceedings.

The trial justice further found that Tikoian "lobbied" the members of the subcommittee to support the Goulet plan through informal meetings at a member's workplace, at Tikoian's home, and through telephone calls. Zarrella testified that he, Sahagian, and Ricci were angered by the telephone calls that they received the night before the workshop, which the trial justice inferred were from Tikoian or Lemont. Furthermore, Zarrella, Sahagian, and Ricci objected to the introduction of slides depicting the merits of the Goulet plan and were so incensed that they threatened to walk out of the workshop. As a result, Goulet did not present the slides. The trial justice, however, found that Lemont then took it upon himself "to advocate[ ] a compromise that was clearly based upon the Goulet plan" because Lemont also "suggested a 100–foot seawall [*sic* ] plan and spoke of expansion to the west." In finding that Lemont had prejudged the case and become an advocate in favor of what he termed "a compromise," the trial justice cited Lemont's testimony at the evidentiary hearing that "I came up with a compromise that I thought would solve the problem, and that's what I wanted to do. I was chairman of the subcommittee. I had heard the testimony. I had

heard the comments of the subcommittee. * * * And I came up with a conclusion that perhaps there might be a compromise that would settle this matter."

The trial justice also made several credibility determinations with regard to testimony about certain comments Tikoian had made expressing his disappointment in the subcommittee recommendation that were published in the *Providence Journal* and the *Block Island Times,* as well as Tikoian's interactions with Governor Carcieri and his staff. The trial justice found that Tikoian had "expressed how he intended to vote" at the CRMC meeting to reporter Peter Lord of the *Providence Journal.* Additionally, the trial justice found that Tikoian informed the Governor that he predicted a tie vote.

Based on these findings, the trial justice held that Champlin's substantial rights had been prejudiced by consideration of the Goulet plan. Further, the court held that the CRMC decision was made upon unlawful procedure and in excess of the CRMC's statutory authority. Additionally, the trial justice found that Champlin's substantial and constitutional rights were violated when Tikoian and Lemont voted on the application, despite what she found to be their demonstrated bias against it.

### iii

### Remedy

Section 42–35–15(g) provides that the trial court "may affirm the decision of the [CRMC] or remand the case for further proceedings, or it may reverse or modify the decision * * *." The trial justice considered it within her discretion to decide on the appropriate remedy. She declined to remand the case to the CRMC for further proceedings because it was her understanding that the General Assembly would be required to pass legislation to implement our advisory opinion entitled *In re Request for Advisory Opinion from the House of Representatives (Coastal Resources Management Council),* 961 A.2d 930 (R.I.2008). We advised in that opinion that proposed legislation permitting lawmakers to sit as members of the CRMC, and allowing the General Assembly to make appointments to the agency, was unconstitutional in light of the separation-of-powers amendments to the Rhode Island Constitution. *Id.* at 940–41. The trial justice expressed concern that any progress on remand would be delayed by the appointment and confirmation process necessary to create a viable CRMC to hear the matter. Thus, the trial justice was "not inclined to remand this case" because it would result in further delay in Champlin's efforts to obtain a decision on its application.

Rather, in reliance on *Acierno v. Folsom,* 337 A.2d 309, 317 (Del.1975), the trial justice simply subtracted the votes of the three disqualified members from the five to five tie vote rendered at the CRMC full council meeting.[6] Accordingly, the trial justice refigured the final vote to four to three in favor of adopting the subcommittee recommendation. She found that the twenty-three subcommittee hearings were unchallenged as to their fairness and that they were untainted by the participation of Zarrella and Lemont. Additionally, the trial justice found that the subcommittee's recommendation was supported by the record amassed at the twenty-three subcommittee hearings. Ultimately, she "[upheld] the decision of the full Council members supporting the Subcommittee Recommendation" because it was "supported by the reliable, probative, and substantial evi-

---

**6.** The trial justice subtracted the votes of Tik- oian, Lemont, and Zarrella.

dence of record." [7]

The CRMC, Tikoian, and intervenors, the Conservation Law Foundation, the Committee for Great Salt Pond, the Town of New Shoreham, the Block Island Land Trust, and the Block Island Conservancy (petitioners), sought review of the Superior Court's decision by petition for certiorari on April 20, 2009, which we granted.[8]

## III

## Standard of Review

The Rhode Island Administrative Procedure Act (RIAPA) chapter 35 of title 42 governs the Superior Court's review of an administrative appeal. Section 42–35–15(g) of the RIAPA sets forth that:

"The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

"(1) In violation of constitutional or statutory provisions;

"(2) In excess of the statutory authority of the agency;

"(3) Made upon unlawful procedure;

"(4) Affected by other error or law;

"(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

"(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."

The RIAPA also limits this Court's review of the Superior Court's judgment in administrative proceedings. Section 42–35–16 ("Review by the [S]upreme [C]ourt"). In conducting such a review, we are restricted to questions of law, which we review *de novo*. *Rossi v. Employees' Retirement System of Rhode Island*, 895 A.2d 106, 110 (R.I.2006) (citing *Johnston Ambulatory Surgical Associates, Ltd. v. Nolan*, 755 A.2d 799, 805 (R.I. 2000)). The factual findings of the administrative agency are entitled to great deference. *Id.* (citing *In re Advisory Opinion to the Governor*, 732 A.2d 55, 60 (R.I. 1999)). However, when the review of the trial court's decision is conducted under a writ of certiorari, as it is here, "this [C]ourt applies the 'some' or 'any' evidence test and reviews the record to determine whether legally competent evidence exists to support the findings." *Sartor v. Coastal Resources Management Council*, 542 A.2d 1077, 1082–83 (R.I.1988).

## IV

## Analysis

## A

## Standing

As an initial matter, we will address Champlin's argument that the CRMC, Tikoian, and the intervenors are not aggrieved parties within the meaning of § 42–35–16, the section of the RIAPA that establishes the requirements for petitioning for a writ of certiorari in this Court after a review of an agency decision by the Superior, Family, or District Court. Specifically, § 42–35–16 requires the petitioner to be "aggrieved by a final judgment of the [S]uperior, [F]amily, or [D]istrict

7. On more than one occasion, the trial justice incorrectly referred to the subcommittee recommendation as a decision.

8. We thank the Nature Conservancy for its amicus curiae brief.

[C]ourt." We are of the opinion that Tikoian, the CRMC, and the intervenors are all aggrieved parties within the statute and, therefore, properly are before this Court.

We do not agree with Champlin's argument that the intervenors are not aggrieved because they have not alleged an environmental injury in fact. The clear language of § 42–35–16 is that the petitioners must establish that they are aggrieved by "a final judgment." Champlin's relies on cases defining the aggrievement requirements for a party seeking judicial review of an agency decision under § 42–35–15(a), which requires the party to be "aggrieved by a final order in a contested case." *East Greenwich Yacht Club v. Coastal Resources Management Council,* 118 R.I. 559, 564, 376 A.2d 682, 684–85 (1977); *see also Blackstone Valley Chamber of Commerce v. Public Utilities Commission,* 452 A.2d 931, 933 n. 3, 934 (R.I. 1982) (holding petitioner did not have standing because petitioner was not aggrieved by *commission's* order). However, it was Champlin's, and not the intervenors, which sought relief under § 42–35–15. Champlin's took advantage of that statutory path of review when it appealed to the Superior Court. The court's substitution of the CRMC decision with the subcommittee recommendation left the intervenors with no avenue of review except through the discretionary writ of certiorari. Therefore, in our view, the intervenors are aggrieved by the Superior Court's final judgment and properly before this Court.

## B

### Evidentiary Hearing

■ The CRMC and Tikoian argue that the Superior Court erred when it granted the evidentiary hearing and that the hearing inevitably delved into the mental processes of the agency members who testified—testimony that the trial justice relied upon in her decision. Conversely, Champlin's argues that the trial justice did not abuse her discretion in conducting the evidentiary hearing and it further contends that the trial justice did not rely on any of the members' deliberative processes when she made her decision.

We are of the opinion that the trial justice did not err when she granted the evidentiary hearing. Pursuant to § 42–35–15(f), in the event of "alleged irregularities in procedure before the agency, not shown in the record, proof thereon may be taken in the court." Standing alone, allegations of impropriety with respect to the off-the-record Goulet plan are sufficient to support the trial justice's election to hold an evidentiary hearing to determine whether procedural irregularities occurred at the agency hearings.

■ The trial justice did not abuse her discretion in granting the hearing even in the face of the possibility that the mental processes of the agency members might be divulged during the hearing. Indeed, prior to the evidentiary hearing, the parties discussed at length the danger that the hearing inevitably would delve into the agency members' mental processes. The trial justice vigorously assured the parties that the hearing would not intrude on the members' mental processes. Additionally, it is well settled that "a trial justice, unlike a jury, can disregard prejudicial material if and when he or she determines that material to be inadmissible." *State v. Notarantonio,* 622 A.2d 457, 458 (R.I.1993). The trial justice promised that she would "run a tight ship," and she warned the attorneys that her ability to disregard such information did not give them free rein to make such impermissible inquiries.

## C

### Quasi–Judicial Immunity

■ The problem here, as we see it, is that even though the trial justice properly

recognized the dangers inherent in this type of hearing, she repeatedly disregarded her own ground rules. The petitioners argue that quasi-judicial officers, like judges, should not be called upon to testify about their mental processes in coming to their decisions.[9] In contrast, Champlin's urges that this issue is a "red herring" because the trial justice did not rely on the agency members' mental processes when she made her decision.

■ After careful review of the transcripts, it is our opinion that the quasi-judicial immunity of the CRMC members repeatedly was violated over objection by the CRMC. The quasi-judicial nature of the CRMC gives rise to certain protections, akin to those enjoyed by the judiciary, to preserve the integrity of adjudication and final judgment. *See In re Request for Advisory Opinion (CRMC)*, 961 A.2d at 940 ("the CRMC combines functions that must properly be characterized as executive with functions that are * * * quasi-judicial in nature"); *Richardson v. Rhode Island Department of Education*, 947 A.2d 253, 258 (R.I. 2008). One such protection is immunity from testifying about the judicial or quasi-judicial officer's mental process in evaluating the evidence and reaching a decision.

■ The United States Supreme Court has held that because a judge could not be subjected to similar inquiry it was improper to question the Secretary of Agriculture at trial and at a deposition with respect to how he considered the evidence before him in his rate-setting responsibilities. *United States v. Morgan*, 313 U.S. 409, 420–22, 61 S.Ct. 999, 85 L.Ed. 1429 (1941). Likewise, the administrative decision makers at the CRMC cannot and should not have been questioned about their mental process in making recommendations to the full council or participating in decision making. *See id.; see also Chicago, Burlington & Quincy Railway Co. v. Babcock*, 204 U.S. 585, 593, 27 S.Ct. 326, 51 L.Ed. 636 (1907) (analogizing state tax assessment board members' testimony concerning "operation of * * * minds" to prohibition against allowing jury members to testify as to "the motives and influences that led to their verdict"). "Only factual matters not reaching the examiner's bases, reasons, mental processes, analyses or conclusions are fair subjects for inquiry." *Green v. Rich Iron Co.*, 944 F.2d 852, 854 (Fed.Cir. 1991) (internal quotation marks omitted).

■ This Court has to date recognized quasi-judicial immunity only in terms of immunity from suit. *See Richardson*, 947 A.2d at 257; *Estate of Sherman v. Almeida*, 747 A.2d 470, 474 (R.I.2000); *Psilopoulos v. State*, 636 A.2d 727, 728 (R.I.1994) ("a quasi-judicial determination made in good faith * * * would be entitled to immunity on the part of the agents as well as the sovereign entity that employed them"); *Calhoun v. City of Providence*, 120 R.I. 619, 631, 390 A.2d 350, 356 (1978) ("Certain types of activities, as for example judicial decision-making * * * must be engaged in by these officials freely, independently, and untrammeled by the possibilities of personal liability"). In our view, however, agency adjudicators also are cloaked with immunity from rendering testimony about their mental processes in reaching decisions just as judicial officers are—lest the compulsion of the testimony of agency adjudicators about their mental process become a favored litigation technique.

---

9. Tikoian petitioned this Court for a writ of certiorari to review the trial justice's order granting the evidentiary hearing and the denial of his motion *in limine* seeking to disallow questioning of all · agency members. This Court denied the petition. *Champlin's Realty Associates v. Tikoian*, No.2007–57–M.P. (R.I., filed Mar. 8, 2007) (mem.).

Five agency members were called to testify at the evidentiary hearing. Although the trial justice assured the parties on the record prior to the evidentiary hearing that mental processes would be off-limits in their questioning, she did not consistently adhere to this crucial pledge. For example, Tikoian testified that

> "My compromise thinking process at that time was that this was a big project. It'd be best if the town and applicant could work something out or whoever could work it out for you as the authoritative body so it was my thought process you try to work out a compromise and we'll make life easier for all of us. That was my thought process."

He also testified,

> "There [were] math errors on that recommendation. There were navigational issues with respect to that recommendation, and as a chairperson, burden of proof, your Honor, based on our rules is what the applicant has to display, technically the minimum impact to the environment. * * * In my mind, that burden of proof wasn't displayed."

Lemont testified that "when we started the hearings, we were at two ends of a pole. There was one group looking for no expansion whatsoever and another looking for 240 feet. When I heard 100 feet, some bells went off and said well, Block Island can live with something."

The following exchange took place during Sahagian's testimony:

> "Q: You felt that the Goulet alternative was way off base in size and scope, right?
> "A: Compared to the evidence and testimony through 23 [hearings], yes.
> "Q: So you disagreed with it, right? That was your problem with the Goulet plan, you didn't like the outcome, right?
> "A: I would disagree. They didn't have the guts to show it in public.
> " * * *
> "Q: You objected because you felt you wanted more than 100 feet?
> "[COUNSEL]: Objection.
> "THE COURT: Excuse me—
> "A: No.
> "THE COURT: The answer may stand."

The trial justice improperly allowed this testimony into the record. Accordingly, we will not consider it. The inclusion of and reliance on the mental processes of agency members also is of material significance in our discussion, *infra*, of the trial justice's disqualification of Lemont on the basis of her finding of bias.

### D

### *Ex Parte* Contacts

■ This Court's opinion in *Arnold* reinforced the parameters of § 42–35–13 [10] of the RIAPA prohibiting agency hearing officers from engaging in *ex parte* contacts. In *Arnold*, we stressed that "no litigious facts should reach the decision maker off the record in an administrative hearing."

---

10. Section 42–35–13 provides:
 "Unless required for the disposition of ex parte matters authorized by law, members or employees of an agency assigned to render an order or to make findings of fact and conclusions of law in a contested case shall not, directly or indirectly, in connection with any issue of fact, communicate with any person or party, nor, in connection with any issue of law, with any party or his or her representative, except upon notice and opportunity for all parties to participate; but any agency member:
 "(1) May communicate with other members of the agency, and
 "(2) May have the aid and advice of one or more personal assistants."

*Arnold,* 941 A.2d at 821. Thus, under § 42–35–9(e) and § 42–35–10(4), if the decision maker "intends to consult any documentary source or person concerning facts or opinions about the merits of an appeal," he or she must notify the parties so that they may "contest any such evidence" and "cross-examine any people consulted." *Arnold,* 941 A.2d at 821. This prohibition extends to the decision maker's communications with agency staff members, although communication regarding general matters is permissible. *Id.*

### Goulet Plan

■ It is clear to us—and the petitioners do not dispute—that Lemont's and Tikoian's communications with the CRMC staff members about the Goulet plan and the plan itself represent *ex parte* contacts under our holding in *Arnold.* The Goulet plan is an *ex parte* contact under § 42–35–13 because Lemont, a decision maker, consulted the director of the CRMC, Fugate, about facts concerning the merits of an appeal, specifically, whether another feasible plan might be conceived. *See Arnold,* 941 A.2d at 821. Fugate, in turn, requested that Goulet create such an alternate plan. Thus, as the trial justice ruled, the Goulet plan clearly falls within the ambit of our holding in *Arnold,* and it should have been included in the administrative record and subject to cross-examination. *See id.*

### Tikoian's Contact with the Governor and His Staff

■ Similarly, we decline to disturb the trial justice's finding that Tikoian's contacts with Governor Carcieri and his staff also constituted impermissible *ex parte* contacts within § 42–35–13 as inter-preted by this Court in *Arnold.* The petitioners concede that Tikoian's presence in the Governor's office during the presentation by the CRMC staff may be considered an *ex parte* contact under *Arnold.* However, they maintain that the communications between Tikoian and the Governor's office pertained solely to procedure, and thus those contacts do not come within the purview of § 42–35–13.

The trial justice, after hearing testimony from her ring-side seat at the evidentiary hearing, "reject[ed] [Governor's aide Mark] Adelman's effort to back away from" his statement that Tikoian predicted a tie vote.[11] Further, the trial court also found that Tikoian "also wanted to obtain the Governor's input and approval of the course he was taking." Adelman testified that "the Governor did indicate at that meeting that the alternative plan * * * was a better option than the full plan." Thus, Tikoian, as a decision maker on the CRMC, sought an off-the-record opinion from a third party about the merits of the application when he took the initiative to engage the Governor and determine the Governor's feelings about the pending application. But, the parties were not notified of this consultation and it never became part of the record. Therefore, the Governor's opinion reached the decision maker off the record in violation of *Arnold's* interpretation of § 42–35–13.

### Remedy for *Ex Parte* Contacts

■ The trial justice correctly noted that although *Arnold* "clarified illicit ex parte communications in the administrative context in Rhode Island, it did not provide a specific remedy for such improper contact." The petitioners submit that the trial justice erred because she did not

---

11. Mark Adelman was a policy analyst in Governor Carcieri's office assigned to advise the Governor with regard to the CRMC and Champlin's application. He communicated with Tikoian about Champlin's application.

remand the matter to the CRMC. They argue that the trial court misinterpreted the impact of *In re Request for Advisory Opinion (CRMC)*, on the ability of the CRMC to expeditiously hear the matter on remand. They further argue that the failure to remand to the agency deprives the petitioners, including the intervenors, of an appeal as of right to the Superior Court from the CRMC decision and restricts them to seeking the discretionary writ of certiorari from this Court. This, they say, is a violation of their right to due process. Champlin's submits that the trial justice did not err in declining to remand to the CRMC because the decision whether to remand the matter to the CRMC was within her discretion, and remand was neither required nor feasible.

In our opinion, the trial justice erred when she simply subtracted the votes of the members that she held to be biased and when she elevated the subcommittee recommendation to become, in effect, a final decision of the CRMC, because the recommendation was untainted by the Goulet plan. We hold, especially in light of our decision in *Arnold*, that the only appropriate remedy here is remand to the agency for supplementation of the record with the *ex parte* communications to be included to allow the parties to appropriately respond and cross-examine. *See Arnold*, 941 A.2d at 821.

Under *Arnold*, Lemont's contacts with Fugate and Goulet may have been proper had he notified the parties of his intention to seek out an alternate plan, disclosed the request and the resultant plan on the record, and invited the parties to contest the evidence contained in the plan and to cross-examine Goulet concerning his findings. *See Arnold*, 941 A.2d at 821. But here, the parties were not afforded the opportunity to contest the Goulet plan. Indeed, the Goulet plan was not created until all the evidence had been submitted to the subcommittee and the hearings were concluded. Thus, the Goulet plan represents the very type of "secret evidence" proscribed in *Arnold*, and the Superior Court should have remanded the matter to the CRMC for supplementation of the record. *See Arnold*, 941 A.2d at 822.

■ It is the petitioners' position that the CRMC is constitutionally sound and "able to act." The parties agreed that, at the time of oral argument before this Court, the CRMC was composed of eight members, all of whom were gubernatorial appointees. In *In re Request for Advisory Opinion*, this Court advised that, in light of the 2004 separation-of-powers amendments to the Rhode Island Constitution and the CRMC's exercise of executive power, it was unconstitutional for members of the General Assembly to serve on the council or for the General Assembly to appoint the CRMC members. *In re Request for Advisory Opinion (CRMC)*, 961 A.2d at 933, 941–42. Rather, it is the Governor who has the constitutional authority to appoint CRMC members with the advice and consent of the Senate. *Id.* at 942. Although the trial justice noted that we acknowledged the *de facto* validity of the CRMC's acts since the 2004 amendments, she incorrectly concluded that legislation was required to "accommodate" this Court's advisory opinion when she declined to remand the matter to the agency.

The trial justice was also concerned about further delays that would be occasioned by the legislative process and gubernatorial appointments. Although it is unfortunate that this litigation has been stewing for nearly seven years, both parties have contributed to its longevity. Given the serious environmental impact on the Great Salt Pond that the expansion of the marina may engender, a decision on

Champlin's application cannot be made lightly. Thus, we do not accept the Superior Court's analogy to *Sakonnet Rogers, Inc. v. Coastal Resources Management Council*, 536 A.2d 893, 897 (R.I.1988), in which this Court reversed a CRMC decision because of the CRMC's failure to base its decision on any of the required criteria and declined to remand to the agency in light of the seven years that had elapsed since the application was filed. The issue in *Sakonnet* revolved around an application for alteration of a shoreline in connection with the relocation of a single small cottage to an empty lot. *Id.* at 894. There is simply no comparison between the discrete facts in that case and the situation currently before us, to say nothing of the major environmental considerations before the CRMC in this application to expand a substantial marina into an ecologically sensitive coastal feature.

Therefore, this Court holds that the trial justice erred as a matter of law in not remanding the case to the CRMC to supplement the record with the Goulet plan and to allow the parties to respond and cross-examine.

## E

### Trial Court's Finding of Bias

 A finding of bias is a finding of fact. *Kelley v. City Council of Cranston*, 61 R.I. 472, 484, 1 A.2d 185, 190 (1938). Therefore, we afford great deference to the trial justice's finding that Tikoian, Lemont, and Zarrella were biased and will overturn her findings of bias only if they are not supported by legally competent evidence. *See Sartor*, 542 A.2d at 1082–83.

 When an administrative agency carries out a quasi-judicial function, it has an obligation of impartiality on par with that of judges. *See Town of Richmond v. Wawaloam Reservation, Inc.*, 850 A.2d 924, 933 (R.I.2004). Under the Fourteenth Amendment, administrative tribunals must not be "biased or otherwise indisposed from rendering a fair and impartial decision." *Davis v. Wood*, 444 A.2d 190, 192 (R.I.1982); *see also Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980) ("The Due Process Clause entitles a person to an impartial and disinterested tribunal * * *."). At the same time, as the trial justice noted, adjudicators in administrative agencies enjoy a "presumption of honesty and integrity." *Davis*, 444 A.2d at 192. This presumption may be overcome through evidence that "the same person(s) involved in building one party's adversarial case is also adjudicating the determinative issues" or if "other special circumstances render the risk of unfairness intolerably high." *Kent County Water Authority v. State (Department of Health)*, 723 A.2d 1132, 1137 (R.I.1999) (citing *La Petite Auberge, Inc. v. Rhode Island Commission for Human Rights*, 419 A.2d 274, 285 (R.I.1980)). Significantly, an agency adjudicator must not become an "advocate or participant." *Davis v. Wood*, 427 A.2d 332, 337 (R.I.1981). To maintain public confidence in the fairness of the agency's decision making, an agency adjudicator also must not prejudge a matter before the agency. *See Barbara Realty Co. v. Zoning Board of Review of Cranston*, 85 R.I. 152, 156, 128 A.2d 342, 344 (1957). This Court has held that a judge must recuse himself or herself when the judge possesses "a 'personal bias or prejudice by reason of a preconceived and settled opinion of a character calculated to impair his [or her] impartiality seriously and sway his [or her] judgment.'" *Ryan v. Roman Catholic Bishop of Providence*, 941 A.2d 174, 185 (R.I.), *cert. denied*, —— U.S. ——, 129 S.Ct. 422, 172 L.Ed.2d 305 (2008) (quoting *Kelly v. Rhode Island*

*Public Transit Authority,* 740 A.2d 1243, 1246 (R.I.1999)).

■ It is important to note that engaging in *ex parte* contacts alone does not automatically render a decision maker biased. *See Professional Air Traffic Controllers Organization v. Federal Labor Relations Authority,* 685 F.2d 547, 573 (D.C.Cir.1982) (*PATCO*). Moreover, the term *"ex parte* contact" has more than one meaning in the context of this case.[12] In concert with other conduct, however, an agency adjudicator's *ex parte* contacts may support a finding of bias. *See Eacret v. Bonner County,* 139 Idaho 780, 86 P.3d 494, 500 (2004) (citing *Barbara Realty Co.,* 85 R.I. at 156, 128 A.2d at 344) (characterizing agency adjudicator's prejudgment of proceeding, as evidenced through public statements along with the same adjudicator's *ex parte* communications, as a "cause for concern" and as factually similar to *Barbara Realty*).

As the trial justice correctly stated, Rhode Island's "standard for disqualification based on bias or prejudice is well-settled." We are satisfied that the trial justice's factual findings of bias with respect to Tikoian and Zarrella are supported by legally competent evidence.

### Michael Tikoian

■ The petitioners all maintain that Tikoian's contacts with subcommittee members should not be considered *ex parte.* In addition, the intervenors maintain that those contacts with the Governor and his staff and the statements to the media should not be considered *ex parte* communications. Also, the CRMC and

Tikoian further contend that, even if the communications with the Governor and his staff and his statements to the media are *ex parte* contacts, they do not support a finding of bias. Not surprisingly, Champlin's argues that the trial justice had a "sufficient evidentiary basis" to disqualify Tikoian.

The trial justice relied on several of what she found to be contraventions of Tikoian's "role as an agency adjudicator" in concluding that he was biased. First, the trial justice cited Tikoian's communication with various subcommittee members wherein he promised a "compromise plan" and his subsequent efforts to "lobby" them to support the ultimate Goulet plan. This, she found, violated the statutory prohibition against *ex parte* contacts with the subcommittee members. The trial justice noted that Tikoian's attempt to exert influence over the subcommittee went to the extent of threatening one member that he would not be reappointed to his seat on the CRMC if he did not support the Goulet plan. Second, the trial justice relied on Tikoian's contact with the Governor's office as evidence that he had "abandoned his role as an impartial adjudicator." Third, the trial justice pointed to Tikoian's communications with reporters as an indication of the "degree of his prejudgment." The trial justice thus found that these contacts, "in the aggregate," established Tikoian's bias and necessitated his disqualification.

Mindful of our standard of review, we hold that the trial justice's finding that Tikoian was biased is supported by legally competent evidence. Importantly, the bases for her finding of Tikoian's bias and resultant disqualification related to his

---

12. An *ex parte* contact such as was present in *Arnold v. Lebel,* 941 A.2d 813 (R.I.2007) may be completely free of any bias, partiality, or prejudgment on behalf of an agency adjudicator who seeks the off-the-record information. These are not *ex parte* contacts in the tradi- tional sense of the term, that is, an adjudicator's off-the-record communication with an interested individual. Therefore, the meaning *"ex parte"* in the context of the bias analysis is distinct from the meaning used in the *Arnold* analysis.

specific actions and not to his mental processes as an agency adjudicator. She found that he settled on a desired outcome long before the full council hearing and that he worked tirelessly to advance it. The trial justice concluded that Tikoian's efforts to sway the subcommittee and the full CRMC, his statements to the press, and his attempt to divine the position of the Governor's office, all evinced " 'a preconceived or settled opinion.' " *See Ryan,* 941 A.2d at 185. She also ruled that he improperly advocated against the grant of Champlin's application by making no secret to his colleagues or the local media of his support for an alternative plan and his disdain for Champlin's proposed expansion. *See Davis,* 427 A.2d at 337. Thus, she held that Tikoian publicly prejudged Champlin's application and that he was incapable of fulfilling the role of "an impartial trier of fact." *See id.* In doing so, she made extensive credibility determinations during the evidentiary hearing, to which we defer, and, which we decline to disturb on appeal. Champlin's is entitled under the guarantees of due process to feel confident that an impartial administrative tribunal is conscientiously considering its application on the basis of "its own circumstances." *See id.*

It is not our intent to discourage healthy debate among members of a quasi-judicial board. We do, however, accept the trial justice's holding that Tikoian crossed the line in advocating for one position over another. Further, we recognize that carrying out the functions of state government requires cooperation and the exchange of ideas. The Governor and his staff have an understandable interest in staying abreast of the progress of a high profile matter affecting Rhode Island. However, we are also of the opinion that staying current on important issues moving through agency proceedings can and must be done without engaging in undisclosed *ex parte* contacts. Particularly in light of the fact that Tikoian was the chairman of the CRMC, it is "in keeping with the high canons of justice and fair play if he is disqualified." *Barbara Realty Co.,* 85 R.I. at 157, 128 A.2d at 344. We affirm the trial justice's finding that Tikoian's bias warranted his disqualification from participation with regard to Champlin's application.

### Gerald Zarrella

■ We also hold that the trial justice was not clearly wrong in her finding that Zarrella was biased. The trial justice found that Zarrella displayed a "personal bias against the Town" and in favor of Champlin's. First, she based this finding on Zarrella's communications with town officials in which Zarrella said that Champlin's was "entitled to this expansion" and the islanders were "naive." Second, the trial justice relied on Zarrella's negative comments about the town's witnesses and its alternate plan following a hearing. Third, she focused on Zarrella's favorable comments about Champlin's.

Like Tikoian, Zarrella demonstrated difficulty in acting as an impartial trier of fact. Rather, he took it upon himself to further the cause of one party over another in his unabashed affinity for Champlin's position and disdain for that of the town's. In tandem, his statements to town officials concerning Champlin's entitlement to expansion and his criticisms of the town and its residents for what he perceived as their naivete in resisting development effectively rebutted his presumed status as an honest adjudicator. *Davis,* 444 A.2d at 192. In the hearing process, the town enjoys the same due process guarantees as Champlin's; it should be assured that it has a fair chance to make its argument before the subcommittee and full council without facing the additional hurdle of convincing an

agency adjudicator who has entrenched himself in a contrary position. *Barbara Realty Co.*, 85 R.I. at 156, 128 A.2d at 344. Therefore, Zarrella's activities during the workshop and the CRMC hearing has constitutional implications as a result of his " 'preconceived and settled opinion' " concerning Champlin's and his personal feelings toward the parties involved. *Ryan*, 941 A.2d at 185. When viewed in light of the trial justice's extensive credibility findings during the evidentiary hearing and through the prism of the deference owed to the trial justice's factual findings, we will not disturb on appeal the trial justice's findings that due process demands Zarrella's disqualification because of demonstrated bias.[13]

### Paul Lemont

■ The petitioners contend that the trial justice erred when she found that Lemont was biased and when she disqualified him on the basis of his *ex parte* contacts in connection with the Goulet plan. They contend that the town already had introduced a 100–foot plan into evidence, prior to Lemont's request for the alternate Goulet plan, and thus Lemont had properly formed an opinion on the basis of the proceedings on the record. Additionally, the petitioners argue that the trial justice failed to recognize that, like Lemont, the other subcommittee members also favored a modified expansion that was not independently supported by the record. Although the respondent noted that "it is perfectly appropriate for a judicial officer overseeing a contested hearing to urge the parties to compromise," Champlin's argues that Lemont was biased because he became an advocate for the "best interests of the Town" in trying to reach a compromise that was only acceptable by the town rather than Champlin's.

We hold that the trial justice's finding that Lemont was biased is not supported by legally competent evidence. First, the trial justice premised her conclusion as to Lemont's bias on the fact that he directed Fugate to recruit Goulet to formulate the alternate plan and his lobbying for the Goulet plan to other subcommittee members. Additionally, the trial justice found bias in Lemont's effort to "infect" the workshop and full council with a thinly veiled version of the Goulet plan. She described Lemont as "act[ing] in concert with Tikoian." Also, the trial justice based her finding of Lemont's bias on his meeting with the Governor "to discuss the status of the case." Finally, the trial justice relied on Lemont's admission during the evidentiary hearing "that he was influenced by outside pressures."

As discussed, the evidentiary hearing repeatedly and improperly subjected agency members to questioning that revealed the members' mental processes as agency adjudicators. Lemont was no exception. Despite her assurances to the contrary, the trial justice clearly relied on Lemont's testimony as to his mental process when she made her finding that Lemont was biased by virtue of his commitment to a "compromise." Indeed, the trial court's decision quotes directly and at length from Lemont's testimony in which he discussed his mental process that led him to decide that a compromise was the only appropriate resolution of the matter after he began reviewing the evidence. The trial justice's decision states:

> "Lemont testified that although he did not favor any expansion initially, he later decided to support a compromise to get the matter resolved. * * * He testified that he 'saw all of the cumulative things that were going on, the editorials, et

---

**13.** Zarrella is no longer a member of the CRMC.

cetera, et cetera, I came up with the thought that perhaps we could compromise this, that everybody could get something, and the matter would be resolved.'"

The decision also quoted his testimony that

"I came up with a compromise that I thought would solve the problem, and that's what I wanted to do. I was chairman of the subcommittee. I had heard the testimony. I had heard the comments of the subcommittee. I was looking for something that would be a compromise. There were many people that I heard on Block Island that wanted no expansion. There were later, some of the letters that I did look at, no expansion. I read the editorial in the Block Island paper, the letters to the editor. I listened to your witnesses. I listened to all of the witnesses. And I came up with a conclusion that perhaps there might be a compromise that would settle this matter."

Therefore, in his responses to questions posed to him at the evidentiary hearing, Lemont testified as to "the process by which he reached the conclusion[ ]" that he would not join in the subcommittee's recommendation to the CRMC. *See Morgan*, 313 U.S. at 422, 61 S.Ct. 999. The only proper area of inquiry concerning Lemont was to factual matters, and the trial justice erred when she relied on anything else. *See Green*, 944 F.2d at 854. The passages of Lemont's testimony quoted in the Superior Court's decision are replete with examples of Lemont's mental process. The trial justice relied on testimony that went beyond factual assertions about what evidence was before Lemont. On the contrary, his testimony discussed his conclusion that a compromise was appropriate and how he reached this conclusion. As Justice Holmes characterized the examination of the "operation of [the tax assessment board's] minds" in *Babcock*, "[t]his was wholly improper." *Babcock*, 204 U.S. at 593, 27 S.Ct. 326.

When Lemont's testimony of his mental process is removed from consideration, we are of the opinion that the trial justice's finding of bias on the part of Lemont was error because the remaining legally competent evidence is far too flimsy to support such a conclusion. As the trial justice correctly noted, "disqualification is a severe sanction." Therefore, Lemont's *ex parte* communication with Fugate in seeking what became known as the Goulet plan and his communication with the Governor regarding the "status of the case," while improper, are insufficient to demonstrate the prejudgment and bias necessitating disqualification. Additionally, Lemont's instruction to Goulet to show the plan to subcommittee members also is insufficient because, as a subcommittee member himself, Lemont's communication with the other members is not an *ex parte* contact.

We share the trial justice's disappointment in the lax approach that the CRMC members took toward insulating themselves from improper *ex parte* contacts. However, the occurrence of *ex parte* contacts does not require disqualification in every instance. *See, e.g., PATCO*, 685 F.2d at 573 (disapproving of clearly improper *ex parte* dinner between agency member and interested labor leader, but holding that the contact did not preclude a fair decision to the parties or the public interest). Thus, once the record is sanitized of any mental processes, Lemont is more like the other agency members who the trial justice found regrettably engaged in *ex parte* contacts that did not "rise[ ] to the level that would warrant disqualification" and less like Tikoian or Zarrella.

We hold that the trial justice's finding of Lemont's bias and her disqualification of

him from the workshop and council hearing were not based on legally competent evidence.

## F

### Remedy

 Although the trial justice declared that she had the discretion to fashion an equitable remedy, her ruling on a remedy under § 42–35–15 is a question of law that we review *de novo*. *See Johnston Ambulatory Surgical Associates, Ltd.*, 755 A.2d at 805. The trial justice said that based on the holding in *PATCO*, she had "equitable discretion" to decide whether to vacate the agency's decision. *PATCO*, 685 F.2d at 565. Further, the trial justice quoted *Birchwood Realty, Inc. v. Grant*, 627 A.2d 827, 834 (R.I.1993) for the proposition that "[i]t is clear that the Superior Court justice has *some* discretion in fashioning a remedy when hearing an appeal from an agency decision." (emphasis added.) We do not agree with the trial justice's interpretation that *Birchwood* recognizes this broad authority. Rather, *Birchwood* supports a trial justice's discretion to choose among the remedies provided in § 42–35–15(g), that is, affirm, reverse, remand, or modify an agency decision. Indeed, this Court in *Birchwood*, after recognizing the trial justice's discretion to remand the case, held that the trial justice's "order of remand was simply too broad." *Birchwood*, 627 A.2d at 834. There, we established that there are real limits to the trial justice's discretion in "fashioning" a remedy. *Id.*

Section 42–35–15(g) does not permit the trial justice to substitute the agency's decision with another agency document that is not truly a "decision." The trial justice purported to "uphold" the "decision" of the CRMC members who voted in favor of the subcommittee's recommendation. However, there was nothing to "uphold," because what the members who voted to adopt the recommendation put their signatures to was entitled "Findings of Fact," not "Decision." The wholesale replacement of the agency's decision with a mere recommendation of the subcommittee is not one of the options available to the trial justice under the statute. In elevating the subcommittee over the full council, the trial justice clearly erred because the subcommittee simply is not authorized under the CRMC Management Procedures to render a decision for the CRMC. The subcommittee recommendation remained just that, a mere recommendation to the full council.

We hold that a remand to the agency is necessary so that the *ex parte* contacts of the sort found by the trial justice may be placed in the record and the parties be offered the opportunity to respond.

 Remand to the agency generally is the proper remedy "under a variety of circumstances." 2 Am.Jur.2d *Administrative Law* § 574 at 489, 490 (2004) (listing nine justifications for remand, including unfair agency proceedings and "reversible due process procedural defects" at the agency level); *see Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985) ("If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."). Remand is favorable because of "the unique expertise possessed by administrative agencies." *See Sartor*, 542 A.2d at 1081. This Court has characterized the authority of the Superior Court to remand for further proceedings under

§ 42–35–15(g) as "a broad grant of power * * * to remand, in a proper case, to correct deficiencies in the record and thus afford the litigants a meaningful review." *Lemoine v. Department of Mental Health, Retardation and Hospitals,* 113 R.I. 285, 290, 320 A.2d 611, 614 (1974) (affirming trial justice's order remanding the case to the agency "for the taking of additional evidence").

■■■ We acknowledge that there are instances in which a remand to an administrative agency may not be the most appropriate remedy. For instance, in *Easton's Point Association, Inc. v. Coastal Resources Management Council,* 559 A.2d 633, 636 (R.I.1989), we determined that a trial justice erred when he exceeded the appropriate scope of review upon examination of an agency decision. The matter was before the Superior Court on the appeal of objectors after the CRMC had granted a petition for the construction of a new hotel. *Id.* at 634. After vacating the Superior Court judgment, we grappled with the issue of remedy. *Id.* at 636. In deciding not to remand to the agency, we said, "[w]e do not believe that a remand of this case would further the interests of justice. Since the facts and issues have been developed and clarified, further remand would not provide decisive new information." *Id.*

In this case, however, the record is not complete because the impermissible *ex parte* information must be made available for the examination of the parties. It is therefore our opinion that the interests of justice are best served by a remand.[14]

In our opinion, this case should be returned to the Superior Court with an order that that tribunal remand the matter to the CRMC. That body should be ordered to expeditiously reopen the hearing on the Champlin's application. The record is to be expanded to include the Goulet plan and all supporting materials.[15] Any party may cross-examine individuals involved in the creation of the Goulet plan. The current composition of the CRMC's membership may vote on the matter. Each voting member must certify that he or she has read the entire record before the council, including the transcripts of the subcommittee hearings and workshop and any accompanying evidence, supporting data, and supplementary material. We emphasize that the Superior Court is to direct that the CRMC is to proceed forthwith in bringing this matter to a close.

The epigraph of the trial justice's decision invokes the inherent link between justice and fairness; however, the decision actually precipitated an unfair result.[16] While the trial justice's departure from the statutory scheme more or less operated in Champlin's favor, the town and the intervenors were saddled with an adverse decision but were deprived of an opportunity to respond even though they had no hand in the *ex parte* contacts or the resulting

14. In our view, *Arnold* anticipates remand to the agency to supplement the record in the case of *ex parte* contacts, as evidenced by this Court's holding in that case that the parties "must" have the opportunity contest and cross-examine outside sources consulted on the merits of a matter and, if the final decision is to be based on such information, then it "must be included on the record." *Arnold,* 941 A.2d at 821.

15. Although we are of the opinion that Tikoian's contact with the Governor also constitutes an *ex parte* contact under *Arnold,* Tikoian's continued disqualification from the full council renders it unnecessary to expend more time and resources supplementing the record with those communications.

16. "Fairness is what justice really is." The *New York Public Library Book of Twentieth-Century American Quotations* 130 (1992) (quoting Justice Potter Stewart).

demonstration of bias. Consequently, the town and intervenors were denied the opportunity to appeal a final decision adverse to them, ostensibly made by the CRMC, but actually directed by the trial justice. We are of the opinion that the remedy we order today not only comports with the law, but will preserve the public's trust in the integrity of the administrative process.

## V

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court in part, reverse in part, and remand to the Superior Court with instructions that it remand this matter to the CRMC for further proceedings, consistent with this opinion, on a supplemented record before the CRMC as it currently is constituted.

ROBINSON, J., concurring in part and dissenting in part.

I readily concur in virtually every aspect of this Court's opinion in this difficult and very important case,[17] except with respect to the Court's affirmance of the Superior Court's finding of disqualifying bias on the part of Michael Tikoian.[18] I do not lightly dissent (even if only in part) in a case of such obvious importance. Nevertheless, after careful consideration of the facts and the law, I have no choice in good conscience but to dissent; I do so respectfully, but nonetheless quite vigorously.

I am fully persuaded of the correctness of most of the holdings that are so well articulated in the Court's opinion, and I am pleased to concur in those holdings— most especially (1) the holding concerning the necessity of a remand to the Coastal Resources Management Council (CRMC); (2) the holding that the Superior Court committed clear error when it found disqualifying bias on the part of Paul Lemont; and (3) the holding relative to the principle of quasi-judicial immunity. (I am greatly concerned about preserving intact the doctrine of quasi-judicial immunity, and I readily and wholeheartedly concur in the scholarly and sensible paragraphs of the Court's opinion that address that very significant issue.)[19]

---

**17.** This case is of great importance to those concerned with environmental preservation, to those who seek to engage in construction projects in the coastal areas, and to those interested in the intricacies of administrative law.

**18.** I express no view whatsoever concerning the Superior Court's finding of disqualifying bias on the part of Gerald Zarrella, who is no longer a member of the Coastal Resources Management Council. I would prefer not to pass upon such an issue unless it were absolutely necessary to do so. *See generally PDK Laboratories Inc. v. United States Drug Enforcement Administration,* 362 F.3d 786, 799 (D.C.Cir.2004) (then-Circuit Judge John Roberts, concurring in part) (stating that "the cardinal principle of judicial restraint" is that "if it is not necessary to decide more, it is necessary not to decide more").

**19.** With respect to the quasi-judicial immunity issue, I feel obliged to record in the most emphatic terms my view that any probing of the thought processes of judicial or quasi-judicial officials with respect to their thinking while engaged in decision-making should take place, if ever, only in the most extraordinary of circumstances (which certainly were not present in this case). The probing of the thought processes of such decision-makers is alien to the Anglo–American legal tradition, and I for one could not readily be a party to any liberalization of the law in this domain. If such liberalization were to occur, I think that it is inevitable that the courts would immediately begin to see non-prevailing party after non-prevailing party seek to analyze the thought processes of those decision-makers who reached a result contrary to the wishes of the non-prevailing party. The result would be chaos of the sort that Charles Dickens loved to satirize.

While the foregoing words of laudatory endorsement are written in all sincerity, I must with equal sincerity express my disagreement with the majority's decision to uphold the Superior Court's finding of disqualifying bias [20] on the part of Michael Tikoian. I acknowledge the thoughtful nature of the majority's approach to the troubling question of bias (*vel non* ) on the part of Mr. Tikoian, but I nonetheless remain convinced that the Superior Court clearly erred when it found disqualifying bias on the part of that senior governmental official.[21]

I acknowledge the long-standing requirement that a finding of fact by a *nisi prius* court should be overturned only if said finding is clearly erroneous. That is a demanding requirement, but it is certainly not an insuperable one. *See, e.g., Tavares v. Beck,* 814 A.2d 346, 353 (R.I.2003) (holding that, in the context of a claim for adverse possession, a "trial justice misconceived and overlooked material evidence");

*see also Irving v. United States,* 49 F.3d 830, 836 (1st Cir.1995) (holding that a trial court clearly erred when it had "fundamentally misconstrued the testimony upon which it explicitly and exclusively relied"); *Allen v. Johnson,* 79 Conn.App. 740, 831 A.2d 282, 288 (2003) (holding that the trial court's finding concerning a title issue was "clearly erroneous").[22] With respect to the issue of disqualifying bias on the part of Mr. Tikoian, I have no hesitancy in stating (respectfully) that the Superior Court clearly erred.

In all candor, I consider the finding by the Superior Court (and this Court's affirmance of same) as to the existence of disqualifying bias on the part of Mr. Tikoian to be an unwarranted negative reflection [23] on a man who, based upon my reading of the record, appears to be a conscientious public official—some of whose actions merit criticism in hindsight but who, under settled principles of administrative law, should not be deemed so

**20.** A frequently cited legal reference work defines the word "bias" as meaning "a hostile feeling or spirit of ill will on the one hand or undue friendship or favoritism on the other toward one of the litigants or his or her attorney, with a formation of a *fixed anticipatory judgment* on the part of a judge as distinguished from an open state of mind which will be governed by the law and the facts." 46 Am.Jur.2d *Judges* § 128 (2009) (emphasis added). I believe that the words "fixed anticipatory judgment" in this definition are especially important.

**21.** Even if one considers the Superior Court's ruling concerning the disqualifying bias on the part of Mr. Tikoian to be a close call (and I do not), it is my view that the "presumption of integrity" (*see* discussion of said principle, *infra* ) should militate against a finding of disqualifying bias. *See Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). It is my opinion that that is precisely what the presumption of integrity is meant to do. Employing a "tie goes to the runner" approach in close call situations serves (*inter alia* ) the goal of discouraging the filing of

minimally supported motions seeking recusal or disqualification. *See* footnote 26, *infra.*

**22.** Appellate determinations that a *nisi prius* court has clearly erred are by no means in the "once in a blue moon" category. Indeed, in this very case the Court holds (and I readily concur in that holding) that the trial justice clearly erred in finding disqualifying bias on the part of Paul Lemont.

**23.** I wish to emphasize that I very definitively do not read the majority opinion as suggesting that there was any sort of *ignoble* motivation on Mr. Tikoian's part. It is my understanding that my colleagues in the majority as to the Tikoian issue simply share the trial justice's conviction that, at some point during the administrative proceedings relative to this case, Mr. Tikoian's thought processes became fixed to such an extent that he could no longer render an unbiased decision. It is my view, by contrast, that the record does not support a finding that his thought processes had become fixed to such an extent. *See* footnote 20, *supra.*

biased as to be disqualified from further participation in this case. In my mind, disqualifying a judicial or quasi-judicial officer for bias should be a most uncommon occurrence. It should take place only after a careful balancing process. *See, e.g., Ryan v. Roman Catholic Bishop of Providence,* 941 A.2d 174, 185 (R.I.2008) ("It is a well-recognized principle that judicial officers are duty-bound to recuse themselves if they are unable to render a fair or an impartial decision in a particular case. * * * At the same time, however, justices have an equally great obligation **not** to disqualify themselves when there is no sound reason to do so.") (quotation marks omitted). In my judgment, by upholding the Superior Court's finding of disqualifying bias on the part of Mr. Tikoian, the majority has wandered off the path outlined by precedent; and I regretfully predict that the result will be that those involved in administrative adjudication in this jurisdiction in the future will "reap the whirlwind." [24]

In my view, the trial justice in the Superior Court and the majority of this Court have erred because they have not given sufficient weight to the long-recognized *presumption of regularity* that attaches to the acts of public officials. A cogent description of that vitally important presumption may be found in the United States Supreme Court's unanimous opinion in the case of *United States v. Chemical Foundation, Inc.,* 272 U.S. 1, 47 S.Ct. 1, 71 L.Ed. 131 (1926). In that case, the Supreme Court wrote as follows:

"The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *Id.* at 14–15, 47 S.Ct. 1.[25]

As this Court has similarly stated, "[a]ny administrator is presumed to be neutral unless proven to be otherwise." *In re Cross,* 617 A.2d 97, 100 (R.I.1992); *see also Nelson v. Dodge,* 76 R.I. 1, 11–12, 68 A.2d 51, 56–57 (1949); *Kelley v. City Council of Cranston,* 61 R.I. 472, 482–83, 1 A.2d 185, 189 (1938).

In a similar vein, Justice Byron White, writing for a unanimous Supreme Court in the frequently cited case of *Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975), expressly alluded to the principle that a contention of bias in an administrative adjudication "must overcome a *presumption of honesty and integrity* in those serving as adjudicators." *Id.* at 47, 95 S.Ct. 1456 (emphasis added); *see also Larue v. Registrar of Motor Vehicles,* 568 A.2d 755, 758–59 (R.I.1990); *Davis v. Wood,* 444 A.2d 190, 192 (R.I.1982).

In *Gorman v. University of Rhode Island,* 837 F.2d 7 (1st Cir.1988), a significant due process case involving the University of Rhode Island's University Board on Student Conduct, the United States Court of Appeals for the First Circuit wrote as follows:

"It would seem clear that the role of the board before whom the student appears is quasi-judicial, which presupposes the indispensable prerequisites of integrity and objectivity. * * * Generally, in examining administrative proceedings, the

---

**24.** *Hosea* 8:7 (King James).

**25.** *See also United States v. Morgan,* 313 U.S. 409, 421, 61 S.Ct. 999, 85 L.Ed. 1429 (1941); *Beverly v. United States,* 468 F.2d 732, 743 (5th Cir.1972) (noting "the well recognized presumption as to the regularity of the acts of public officials"); *Chequinn Corp. v. Mullen,*

159 Me. 375, 193 A.2d 432, 435 (1963) ("The good faith of a public official is not lightly to be denied. Proof of prejudice and bias sufficient to overcome the sense of responsibility to office and to community must be heavy."); *see generally* 67 C.J.S. *Officers* § 240 (2002).

presumption favors the administrators, and the burden is upon the party challenging the action to produce evidence sufficient to rebut this presumption." *Id.* at 15.

After examining the record in the case at bar, it is my conclusion that the party that sought to disqualify Mr. Tikoian failed to produce "evidence sufficient to rebut" the vitally important *presumption* of "integrity and objectivity" to which the First Circuit made such unequivocal reference in *Gorman. See id.*

Considering the effect of the presumption of integrity on the case at bar, it should be emphasized *ab initio* that there is not the slightest hint in the record of any self-dealing or similar improper motivation on Mr. Tikoian's part;[26] in my judgment, this is a consideration of great importance.[27] Instead, the more I scrutinize the record, the clearer it becomes to me that Mr. Tikoian's motivation in the midst of the administrative proceedings was simply to attempt to bring about a compromise solution with respect to a highly controversial application.[28] Mr. Tikoian's alleged bias was rather a temporary "tilt" of an intellectual and pragmatic sort[29] (as contrasted with a bias stemming from self-interest or from a "fixed judgment"); and there is no evidence in the record that convinces me that, if he were allowed to participate in the further proceedings that will take place at some future date, his views would not further evolve in one direction or the other, as they had in the past.[30]

**26.** I think it important to repeat that I do not infer from the majority opinion any suggestion that the majority deems Mr. Tikoian's conduct to have been unethical or the product of moral turpitude. My understanding of the majority's viewpoint is that it was inclined to find as not clearly erroneous the trial justice's position that, in a close case, one should understand the maxim "the tie goes to the runner" as meaning that, when faced with an apparent "tie" or fifty-fifty call as to disqualifying bias *vel non*, the "tie" should be resolved in favor of recusal—whereas I believe that it should be resolved in favor of non-recusal.

**27.** I recognize that bias does not necessarily stem from extrajudicial sources. *See Ryan v. Roman Catholic Bishop of Providence*, 941 A.2d 174, 185–86 n. 21 (R.I.2008); *see generally Liteky v. United States*, 510 U.S. 540, 551, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994); *State v. Nordstrom*, 122 R.I. 412, 414, 408 A.2d 601, 602 (1979). With respect to the case at bar, however, I am unable to conclude from the record that there was sufficient evidence of disqualifying bias on the part of Mr. Tikoian— regardless of whether one takes into account extrajudicial sources or occurrences within the administrative proceedings.

**28.** In my judgment, it is significant that the record discloses that Mr. Tikoian's interest in what came to be called "the Goulet plan" was not present at the outset of the CRMC proceedings; it came about only *after* the administrative proceedings were underway. I can find absolutely no evidence in the record that Mr. Tikoian had a "fixed anticipatory judgment" (*see* footnote 20, *supra* ) when those proceedings commenced. Moreover, I can perceive no sufficient evidence in the record to support a finding that he had a *fixed* judgment at any later time as those proceedings went forward.

**29.** As I discuss further in the next paragraph of the text, it is a basic feature of the human reasoning process that numerous temporary intellectual "conclusions" are reached in the course of an administrative or judicial proceeding before the final conclusion is reached at the end of the proceeding.

**30.** It is clear from the record that Mr. Tikoian showed an ability to modify his thinking about the proposed project as time went by. Significantly, it appears from the record before us that Mr. Tikoian wished to subject the petition of Champlin's to an immediate vote of the full CRMC when the petition was initially proposed. Moreover, it was Mr. Tikoian who appointed Mr. Zarrella (who the record reveals to be at all times favorably inclined towards the proposed project) to the subcommittee. In my view, these facts constitute

It is apparently undisputed that Mr. Tikoian was not challenged as being biased when the administrative proceedings began. If, during the course of those proceedings, he formed certain tentative intellectual conclusions as to how the issues presented might best be resolved, my view would be that having such tentative viewpoints is entirely appropriate in the decision-making process. What he did is what any responsible decision-maker does: he or she listens to the evidence and formulates or reformulates tentative conclusions—without excluding the possibility that subsequent evidence or argument might sway him or her in another direction. I believe that the following particularly eloquent and perceptive passage from a well-known book written by a very distinguished (and recently deceased) federal judge accurately and succinctly describes the decision-making process:

> "I see decision-making as neither a process that results in an early conviction based on instant exposure to competing briefs nor one in which the judge keeps an open mind through briefs, discussion in chambers, argument, and conference, and then summons up the will to decide. **I see the process, rather, as a series of shifting biases.** * * *
>
> "One reads a good brief from the appellant; the position seems reasonable. But a good brief from appellee, bolstered perhaps by a trial judge's opinion, seems incontrovertible. Discussion with the law clerks in chambers casts doubt on any tentative position. Any such doubt may be demolished by oral argument, only to give rise to a new bias, which in turn may be shaken by the postargument conference among the judges. * * * The guarantee of a judge's impartiality lies not in suspending judgment throughout the process but in recognizing that each successive judgment is tentative, fragile, and likely to be modified or set aside as a consequence of deepened insight." Frank M. Coffin, *The Ways of a Judge: Reflections from the Federal Appellate Bench* 63 (1980) (emphasis added).

In my judgment, that passage from Judge Coffin's fine little book deserves multiple re-readings and careful reflection. I am not aware of any more insightful explanation of the manner in which the decision-making process operates; the quoted passage is a profound reflection upon the manner in which the human intellect proceeds (*viz.,* in a halting and tentative way) before it reaches a conclusion with respect to a complex matter. In my view, the above-quoted words of Judge Coffin are fully applicable to Mr. Tikoian's decision-making process in the case at bar.

I believe that it is a regrettable error for this Court to uphold the disqualification of Mr. Tikoian with respect to *future* proceedings [31] on the basis of any past in-

---

meaningful evidence that Mr. Tikoian's initial thinking was far from what it later became. In plain English, Mr. Tikoian's thinking *evolved* over time.

**31.** It is clear that the trial justice did not foresee the need for any future proceedings when she carried out her virtually unprecedented arithmetical readjustment of the votes cast by certain members of the CRMC (*viz.,* Mr. Tikoian, Mr. Lemont, and Mr. Zarrella) with respect to the application at issue. (It will be recalled that the trial justice carried out her arithmetical readjustment after she had ruled that Mr. Tikoian and the other two just-mentioned members of the CRMC should be disqualified, resulting in their votes not being counted.)

However, as a result of today's holding of the Court as to remedy (in which holding I unequivocally concur), there will now be further administrative proceedings with respect to this case. It is my definite conviction that the majority errs in holding that Mr. Tikoian should be disqualified from participating in those future proceedings.

discretions in connection with this case. After long and careful consideration, I have been unable to locate in the record sufficient evidence of abiding bias to justify the disqualification of a man whom my reading of the record discloses to be an energetic, innovative, and conscientious public servant. *See generally Del Vecchio v. Illinois Department of Corrections*, 31 F.3d 1363, 1375 (7th Cir. *en banc* 1994) ("The question is not whether some possible temptation to be biased exists; instead, the question is, when does a biasing influence require disqualification?"). In my judgment, one can rightly apply to Mr. Tikoian, *mutatis mutandis*, the following colorful and cogent words written by Justice Felix Frankfurter of the United States Supreme Court with respect to cabinet officers in the often cited case of *United States v. Morgan*, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941):

> "Cabinet officers charged by Congress with adjudicatory functions are not assumed to be flabby creatures any more than judges are. Both may have an underlying philosophy in approaching a specific case. But both are assumed to be [persons] of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances. Nothing in this record disturbs such an assumption." *Id.* at 421, 61 S.Ct. 999.

I am well aware that it is a basic tenet of due process that every case should be tried before an impartial and independent adjudicator. *See, e.g., In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process."); *see also Withrow*, 421 U.S. at 46–47, 95 S.Ct. 1456; *Gorman*, 837 F.2d at 15; *see generally* Henry J. Friendly, *"Some Kind of Hearing,"* 123 U. Pa. L.Rev. 1267, 1269 n. 10 (1975). This principle is applicable "to administrative agencies which adjudicate as well as to courts." *Withrow*, 421 U.S. at 46, 95 S.Ct. 1456; *see also Gibson v. Berryhill*, 411 U.S. 564, 579, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973). Yet, as several distinguished jurists have noted, that basic tenet must coexist with the fact that every sentient person has inherent predispositions. For example, Judge Jerome Frank, writing for the Second Circuit in his eloquent and frequently cited opinion in the case of *In re J.P. Linahan, Inc.*, 138 F.2d 650 (2d Cir.1943), stated:

> "Democracy must, indeed, fail unless our courts try cases fairly, and there can be no fair trial before a judge lacking in impartiality and disinterestedness. *If, however, 'bias' and 'partiality' be defined to mean the total absence of preconceptions in the mind of the judge, then no one has ever had a fair trial and no one ever will.* The human mind, even at infancy, is no blank piece of paper. We are born with predispositions; and the process of education, formal and informal, creates attitudes in all men which affect them in judging situations, attitudes which precede reasoning in particular instances and which, therefore, by definition, are pre-judices. Without acquired 'slants,' pre-conceptions, life could not go on." *Id.* at 651 (emphasis added).[32]

It is self-evident that no judge or administrator should be expected to enter a proceeding with his or her mind being a complete *tabula rasa.* Such a requirement would be at loggerheads with human nature. It is rather the duty of the decisionmaker to be aware of his or her "preconceptions" and "predispositions"[33] and not

---

32. *See also* Benjamin N. Cardozo, *The Nature of the Judicial Process* 167 (1921).

33. *See In re J.P. Linahan, Inc.*, 138 F.2d 650, 651 (2d Cir.1943) (Jerome Frank, J.).

be controlled by them, but rather be controlled solely by the evidence in the record.[34]

For certain, courts have on occasion disqualified adjudicators for bias relating to self-interest. It is the presence of this type of bias, where an adjudicator has some personal stake in the outcome (unlike the above-described "series of shifting biases"[35] of an intellectual and not self-interested sort), that may well constitute a due process violation and require disqualification. *See generally* 2 Charles H. Koch, Jr., *Administrative Law and Practice* § 6.10 (2d ed.1997). For example, in the case of *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927), the United States Supreme Court noted that the adjudicator in question in that case had had "a direct personal pecuniary interest in convicting the defendant who came before him for trial * * *." *Id.* at 523, 47 S.Ct. 437. In view of that fact, the Supreme Court held that "it certainly violates the Fourteenth Amendment and deprives a defendant in a criminal case of due process of law to subject his liberty or property to the judgment of a court, the judge of which has a direct, personal, substantial pecuniary interest in reaching a conclusion against him in his case." *Id.; see also Caperton v. A.T. Massey Coal Co.,* —— U.S. ——, ——, 129 S.Ct. 2252, 2265, 173 L.Ed.2d 1208 (2009) (holding that "the probability of actual bias [rose] to an unconstitutional level" where a judge refused to recuse himself in a case involving a major donor to the judge's election campaign). Likewise, in *Ward v. Village of Monroeville,* 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972), the Supreme Court held that, where the revenue derived from judgments rendered in a mayor's court provided a substantial portion of the municipality's funds, that mayor could not act in a disinterested fashion when serving in a judicial capacity. *Id.* at 59, 93 S.Ct. 80. I repeat that there is *absolutely no indication* in the record of such a pecuniary motivation or other form of self-dealing on Mr. Tikoian's part.

By contrast, it is a well established principle that it is *not* improper for administrators "to form views about law and policy on the basis of their prior adjudications of similar issues which may influence them in deciding later cases." *Rombough v. Federal Aviation Administration,* 594 F.2d 893, 900 (2d Cir.1979); *see also Federal Trade Commission v. Cement Institute,* 333 U.S. 683, 702–03, 68 S.Ct. 793, 92 L.Ed. 1010 (1948) (holding that the Commission's public statements regarding its views on a particular pricing system did not merit disqualification); 2 Koch, at § 6.10. Additionally, an adjudicator should not be "disqualified simply because [he or she] has taken a position, even in public, on a policy issue related to the dispute, in the absence of a showing that he is not capable of judging a particular controversy fairly on the basis of its own circumstances." *Hortonville Joint School District No. 1 v. Hortonville Education Association,* 426 U.S. 482, 493, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976) (internal quotation marks omitted); *see also Morgan,* 313 U.S. at 421, 61 S.Ct. 999; *see generally* 48A C.J.S. *Judges* § 265 (2004). Nothing in the record of this case indicates that Mr. had such a strong intellectual predisposition as to any material issue in this case.

34. Undoubtedly, there will be occasions where a decision-maker has so strong an intellectual predisposition as to a particular issue that due process would require recusal or disqualification. *See* footnote 20, *supra.* However, I see nothing in the record that in any meaningful way suggests that Mr. Tikoian

35. Frank M. Coffin, *The Ways of a Judge: Reflections from the Federal Appellate Bench* 63 (1980).

Tikoian's views would not have evolved further if he was unsuccessful in his attempt at arriving at a compromise through the Goulet plan.

With the sole exception of the trial justice's finding that Mr. Tikoian threatened a subcommittee member that he would not be reappointed if he did not vote for the Goulet plan, nothing in the record convinces me that there was any disqualifying bias on Mr. Tikoian's part. I readily concede that, in making such a threat, Mr. Tikoian acted unwisely and improperly; and, while I neither excuse nor minimize the seriousness of that particular activity, common experience educates us to the fact that a certain amount of "arm wrestling" frequently takes place when a decision-making body (including judicial and quasi-judicial bodies) seeks to arrive at a decision. Indeed, I believe that some degree of vigorous interaction [36] within a group charged with rendering a fair decision is often salutary. Mr. Tikoian should undoubtedly be chastised for having acted in such a manner, and he should be admonished not to act similarly in the future. Nevertheless, I do not believe that the threat articulated by Mr. Tikoian, while inappropriate, was indicative of a permanent or abiding bias on his part. My overall impression, after perusing the entire record and considering the presumption of integrity, is that Mr. Tikoian is a sincere and well-meaning public official who, at a particular point in time, endeavored to bring about a "half-a-loaf" compromise outcome. Search as I may, I am unable to perceive sufficient evidence in the record to justify the Superior Court's finding of disqualifying bias on the part of Mr. Tikoian.

As for Mr. Tikoian's contacts with Governor Carcieri and his staff, they are to me much ado about nothing in terms of a disqualifying bias analysis.[37] I concede that it would have been preferable for Mr. Tikoian to have delegated a subordinate to maintain contact with the Governor's office. But what is significant is the lack of any finding by the trial justice that the Governor or his staff sought to "lobby" or "pressure" Mr. Tikoian in one direction or another. To the contrary, the trial justice explicitly found that the Governor did not attempt to lobby Mr. Tikoian; such a factual finding is, in my judgment, highly significant.[38] Similarly, I consider Mr. Tikoian's statements to various news reporters to be of no real import. *See generally Cement Institute*, 333 U.S. at 702–03, 68 S.Ct. 793. Therefore, it is my conviction that any reliance upon these (concededly *ex parte*) communications should not be dispositive in the disqualifying bias analysis.

Mr. Tikoian may not have acted in all respects exactly as this Court, in recent times, has come to expect quasi-judicial adjudicating officials to act. *See, e.g., Arnold v. Lebel*, 941 A.2d 813, 820–22 (R.I. 2007) (clarifying the norms concerning the duty of administrative adjudicators to avoid *ex parte* contacts in administrative proceedings). That being said, however, I believe that Mr. Tikoian's actions must be judged in light of the substantially more opaque standards that prevailed in the

---

**36.** Let me be clear: permissible "vigorous interaction" within a decision-making body may often include heated rational debate and even a substantial degree of emotional rhetoric, but not an activity such as an actual threat to a fellow member regarding his future on the adjudicative body.

**37.** Governor Carcieri is not a party to this case, nor is any member of his staff.

**38.** The Superior Court did note that Governor Carcieri expressed a tentative preference for a plan involving less expansion than that originally proposed by Champlin's.

pre-*Arnold* era; and I further respectfully maintain that Mr. Tikoian's various *ex parte* contacts that are reflected in the record do not overcome the presumption of integrity or demonstrate the presence of disqualifying bias.

I take no issue with the more exigent considerations relative to *ex parte* contacts which are the result of the clarifications that were spelled out in the quite recent [39] *Arnold* case.[40] However, I think that it is fundamentally unfair to apply those more exigent considerations to the pre-*Arnold* actions of Mr. Tikoian, with the result being that he is held to be disqualified from participating in future administrative proceedings with respect to this case. Now that there has been authoritative clarification of the "ground rules" that should govern administrative proceedings conducted by quasi-judicial officers, I know of no reason not to believe that Mr. Tikoian will henceforth act assiduously in accordance therewith. We as a society expect a great deal of our public officials—including integrity and an acute sensitivity to ethical standards. However, I consider it unwarranted to expect that such officials be clairvoyant as to not yet clearly promulgated expectations and norms. There is something fundamentally unfair in viewing yesterday's activities through today's ethical spectacles (*viz.*, the clarifications articulated in *Arnold*). In my judgment, while remand to the CRMC is an entirely appropriate remedial measure, Mr. Tikoian should not be disqualified from participating in the further proceedings that are to take place.

In further support of the view just expressed, I would note that I am of the same mind as was the circuit court in the leading case of *Professional Air Traffic Controllers Organization v. Federal Labor Relations Authority*, 685 F.2d 547 (D.C.Cir.1982) (*PATCO*). In the *PATCO* case, the United States Court of Appeals for the District of Columbia Circuit held that *ex parte* contacts do not inevitably lead to disqualifying bias. *Id.* at 572–73. In that case, a union leader invited a member of the Federal Labor Relations Authority to dinner. *Id.* at 559. During their dinner conversation, which lasted approximately an hour and a half, the two gentlemen engaged in a fifteen minute discussion regarding a case that was pending before the Labor Relations Authority. *Id.* at 559, 571. The Court of Appeals ruled that, while it did not condone that behavior of the two gentlemen, it did not believe that the *ex parte* dinner conversation "irrevocably tainted the Authority's decision-making process or resulted in a decision unfair either to the parties or to the public interest." *Id.* at 573.[41] While Mr. Tikoian's actions in the instant case were concededly not fully consistent with the administrative law standards recently clarified by this Court in *Arnold*,[42] I am entirely unable to conclude that his ability to perform as an

---

**39.** The opinion in *Arnold v. Lebel*, 941 A.2d 813 (R.I.2007), was issued on December 24, 2007.

**40.** The trial justice apparently considered the *Arnold* opinion to be of moment because, when it came to her attention, she specifically requested that the parties submit legal memoranda addressing the ramifications of that opinion for the case at bar.

**41.** To my mind, the expression "irrevocably tainted" in the *PATCO* decision quoted in the text is of capital importance. Disqualifying bias and the duty to recuse are present when a decision-maker has been *irrevocably* tainted by considerations other than the evidence of record. I do not perceive any basis in the record for concluding that Mr. Tikoian was irrevocably tainted.

**42.** *Arnold v. Lebel*, 941 A.2d 813 (R.I.2007).

impartial decision-maker was irrevocably tainted by what he did.

As I view it, there is, with respect to the Tikoian bias issue, an absolutist tone to the Superior Court's reasoning and to this Court's affirmance thereof; there is a failure to take into account the manner in which decision-making groups operate in the real world.[43] While I certainly do not countenance any departure from high ethical standards by those acting in quasi-judicial capacities, the sometimes rough-and-tumble character of group decision-making is a reality; I believe that beneficial light in the end often emerges from such rough-and-tumble proceedings. I often recall the pithy and sagacious admonition of Justice Oliver Wendell Holmes: "We must remember that the machinery of government would not work if it were not allowed a little play in its joints." *Bain Peanut Co. of Texas v. Pinson*, 282 U.S. 499, 501, 51 S.Ct. 228, 75 L.Ed. 482 (1931) (quoted with approval by this Court in *Plantation Legal Defense Services, Inc. v. O'Brien*, 121 R.I. 595, 597, 401 A.2d 1277, 1278 (1979)); *see also In re Request for Advisory Opinion from the House of Representatives (Coastal Resources Management Council)*, 961 A.2d 930, 933 n. 3 (R.I.2008) (quoting with approval the same admonition of Justice Holmes).

Mistakes were made in this case—undoubtedly.[44] But I find nothing in the record that indicates to me that Mr. Tikoian should be disqualified with respect to future proceedings in this case or that such mistakes cannot be resolved by disclosure of the *ex parte* contacts upon remand to the CRMC. I repeat that I am convinced, after a careful perusal of the record, that Mr. Tikoian was not acting out of some sort of self-interest or personal animus or fixed judgment; I see no evidence that his actions were the product of any improper purpose. Instead, it is clear to me that Mr. Tikoian eventually became convinced, as the proceedings progressed,[45] that a compromise solution might be the best, considering the interests and goals of all concerned.[46] Thereafter, he became familiar with the compromise plan that was cobbled together at the direction of Mr. Lemont ("the Goulet plan"), and he then did his best to convince other CRMC members of the desirability of such a compromise solution. Except for his regrettable use of overly heavy-handed tactics vis-á-vis a fellow member of the CRMC, I do not perceive his actions as being different in kind from those that can be perceived within any decision-making body on any given day.

An intellectually arrived at conviction at one moment in time that a compromise solution might be best does not add up to disqualifying bias; this Court made precisely that point in its unanimous recent

---

**43.** I make this observation without implying any lack of respect for those with whom I disagree concerning the disqualification of Mr. Tikoian. The several bias issues in this case are very difficult, and the opinions of the trial justice and of my colleagues deserve (and have) my genuine respect as being the work product of conscientious adjudicators.

**44.** In Joseph Conrad's novel *An Outcast of the Islands* 154 (1920), one of the characters memorably comments: "It's only those who do nothing that make no mistakes, I suppose."

**45.** *See* Coffin, footnote 35, *supra*, at 63 ("[E]ach successive judgment is tentative, fragile, and likely to be modified or set aside as a consequence of deepened insight.").

**46.** It should at all times be borne in mind that this Court looks with favor on attempts to compromise or settle disputes. *See, e.g., Ryan*, 941 A.2d at 186; *Greensleeves, Inc. v. Smiley*, 942 A.2d 284, 294 n. 19 (R.I.2007).

decision in *Ryan v. Roman Catholic Bishop of Providence*, 941 A.2d 174 (R.I.2008). In that case, this Court lauded the desirability of settlement and compromise, and it ruled that the trial justice's earnest efforts to bring about same were entirely proper. *Id.* at 186–87. I consider the following language from the *Ryan* opinion to be applicable (*mutatis mutandis*) to Mr. Tikoian's efforts to have the CRMC arrive at a compromise decision:

> "In view of the venerable judicial policy of encouraging settlement and endorsing the mediation alternative, it borders on the offensive for a party to claim that a justice should be recused for adhering to this policy. We see no reason why the efforts of a trial justice to encourage settlement is in any way indicative of personal bias or prejudice; by encouraging settlement, a trial justice is not expressing a preconceived view of the case before him or her, but rather is simply promoting this state's sound policy of favoring settlement and/or mediation of disputes." *Id.* at 187.

I am deeply concerned that the majority's opinion with respect to Mr. Tikoian will discourage future compromise and settlement discussions in matters pending before this state's several adjudicative bodies—and I consider that to be a very regrettable result.

When all is said and done, it is my definite view that the presumption of regularity and of integrity has not been overcome with respect to Mr. Tikoian—far from it! I am convinced that the trial justice's finding of disqualifying bias as to him is clearly erroneous. It is further my very respectful conviction that the majority is doing a disservice to a senior public official and to the citizens of this state by upholding the ruling that Mr. Tikoian is so irrevocably biased that he should be disqualified with respect to future proceedings in this case. In my judgment, Mr. Tikoian should be permitted to sit with the other current members of the Coastal Resources Management Council as it considers the additional material that this Court has held it should consider upon remand.

For all of these reasons I very respectfully, but most vigorously, dissent from the majority's affirmance of the Superior Court's finding of disqualifying bias on the part of Michael Tikoian. I express no view as to the Gerald Zarrella issue. With those two exceptions, I am very pleased to concur in all the rest of the Court's opinion.

WILLIAMS, C.J. (ret.), concurring in part and dissenting in part.

I concur with my colleagues' well-reasoned opinion insofar as it (1) affirms the trial justice's authority to hold an evidentiary hearing pursuant to G.L.1956 § 42–35–15(f); (2) affirms the trial justice's findings that Coastal Resources Management Council (CRMC) Chairman Michael Tikoian and subcommittee member Gerald Zarrella were biased and should have been disqualified; and (3) reverses the trial justice's finding that subcommittee Chairman Paul Lemont was biased and should have been disqualified.

With regard to my colleague Justice William P. Robinson's eloquent and passionate dissent from our affirmance of the trial justice's finding that Chairman Tikoian was biased, I agree with his principal argument that administrative adjudicators enjoy a presumption of honesty and integrity that should not easily be refuted. Where I diverge from my distinguished colleague, however, is his characterization of Chairman Tikoian's threat as mere administrative "arm wrestling," which, while inappropriate, did not amount to demonstrated bias. It is my view that Chairman Tikoian's threat to prevent the reappointment of a CRMC member was, *ipso facto,* enough to disqualify him. For me, Chairman Tikoian's threat was sufficiently im-

proper to rebut the presumption that he was acting in a neutral and impartial role as an adjudicator. Once Chairman Tikoian threatened a fellow subcommittee member in his campaign to gain support for the so-called "Goulet plan," he ceased to function as an impartial trier of fact.

As for the Court's decision to reverse the trial justice and remand the matter to the CRMC for consideration of the Goulet plan, I respectfully dissent. I would affirm the trial justice's decision to reverse the CRMC. In my view, once the trial justice determined that the CRMC decision violated the "substantial rights" of Champlin's, it was within her authority and discretion under § 42–35–15(g) to reverse the decision of the CRMC.

I also diverge from that portion of the majority's opinion that suggests that our decision in *Arnold v. Lebel,* 941 A.2d 813 (R.I.2007), requires the Superior Court to remand a case in which *ex parte* contacts are found to have occurred to the administrative agency *in every instance.* In my opinion, the trial justice's determination that the CRMC decision was based upon unlawful procedure and that it was against the clear weight of the evidence was a sufficient basis for her to reverse the CRMC decision rather than remand the matter back to the agency for further consideration of the Goulet plan.

In any event, if reversal of the trial justice were, in fact, warranted, it is my opinion that this Court should remand the matter to the trial justice and *not* to the CRMC, for the purpose of considering the Goulet plan on the record and allowing the parties to examine the plan.

## I

### The Trial Justice's Decision to Reverse the CRMC was Proper Under General Laws 1956 § 42–35–15(g)

As an initial matter, it is important to note that the trial justice held sixteen evi-dentiary hearings and one show-cause hearing, made extensive findings of fact, and concluded that the CRMC had prejudiced the rights of Champlin's in its application for expansion. We are in no position to, nor should we, challenge those findings because our review of a Superior Court's judgment of administrative proceedings is statutorily limited to questions of law. Section 42–35–16; *Iselin v. Retirement Board of Employees' Retirement System of Rhode Island,* 943 A.2d 1045, 1048 (R.I.2008); *Rossi v. Employees' Retirement System of Rhode Island,* 895 A.2d 106, 110 (R.I.2006). "We do not weigh the evidence that was before the trial justice, but merely examine the record to determine whether his or her decision was supported by competent evidence." *Johnston Ambulatory Surgical Associates, Ltd. v. Nolan,* 755 A.2d 799, 805 (R.I.2000) (citing *Barrington School Committee v. Rhode Island State Labor Relations Board,* 608 A.2d 1126, 1138 (R.I. 1992)). Even given this required deference, however, I concur with the majority's view that, in this case, the trial justice's finding that subcommittee Chairman Lemont was biased was not supported by competent evidence as it was grounded in her reliance upon Mr. Lemont's mental processes.

The trial justice's fact-finding efforts in this case are commendable and largely indisputable. After holding a plethora of hearings, she found, *inter alia,* that: (1) certain CRMC members engaged in *ex parte* communications while pressing for the Goulet plan; (2) at least some CRMC members demonstrated bias in violation of their quasi-judicial role as administrative adjudicators; (3) Chairman Tikoian threatened another subcommittee member with the loss of his CRMC seat in an attempt to persuade him to vote in favor of the Goulet

plan; and (4) the CRMC issued a decision that, in light of the evidence presented during the subcommittee hearings, was clearly erroneous.

Based upon these findings, the trial justice determined that the CRMC decision (1) violated constitutional and statutory provisions; (2) was based upon unlawful procedure; (3) was in excess of the agency's authority; and (4) was clearly erroneous, based on the reliable, probative, and substantial evidence on the record. Once the trial justice made this determination, pursuant to § 42–35–15(g), she had the authority to: (1) reverse the CRMC decision; (2) remand the matter to the CRMC; (3) affirm the decision; or (4) modify the decision.

After making her findings of fact, the trial justice determined that the most appropriate resolution of the matter was to reverse the CRMC, rather than remand it with instructions to the CRMC to place the *ex parte* communications (the Goulet plan) on the record. Although her decision was, to some extent, based on her mistaken belief that our advisory opinion in the case of *In re Request for Advisory Opinion from the House of Representatives (Coastal Resources Management Council)*, 961 A.2d 930 (R.I.2008), required the General Assembly to pass legislation before the CRMC would be able to reopen the matter, it primarily was grounded in her belief that further delay in the adjudication of Champlin's application would be an injustice.

This determination by the trial justice was appropriate because both this Court and other jurisdictions have recognized that such an applicant is entitled to a decision from the administrative agency within a reasonable period. *See Sakonnet Rogers, Inc. v. Coastal Resources Management Council*, 536 A.2d 893, 897 (R.I.1988) (*Sakonnet*) (recognizing that petitioners

have a right to have the adjudication of an administrative matter within a "reasonable period"); *see also* 2 Am.Jur.2d *Administrative Law* § 371 (2004) (administrative agency has an "affirmative duty * * * to act in a timely fashion").

Although legislation was not, in fact, required for the CRMC to reopen the matter on remand, at the time the trial justice issued her decision six years had passed since Champlin's filed its application, in 2003. So then, a remand to the CRMC for consideration of the Goulet plan would have exceeded the seven-year time period we found to be unacceptable in *Sakonnet*, 536 A.2d at 897. The trial justice's decision to reverse, therefore, was based on this Court's principle that any further delay in the adjudication of Champlin's application would prejudice its right to a final adjudication of its petition "within a reasonable period." *Id.*

My colleagues' decision to reverse the trial justice is partially based on the principle that administrative matters generally must be completed by the administrative agency and not the courts. 3 Richard J. Pierce, Jr., *Administrative Law Treatise* § 18.1 (5th ed.2010) (most successful appeals of federal agency decisions result in remand back to the agency). Although I generally agree with my colleagues, I recognize that there are limited circumstances in which we have held that a court may order equitable and other relief when agency delays and procedural violations are found. *See Easton's Point Association, Inc. v. Coastal Resources Management Council*, 559 A.2d 633, 636 (R.I.1989) (remand to the agency would be an injustice after trial justice exceeded scope of review, which unreasonably delayed adjudication of petitioner's application); *Sakonnet*, 536 A.2d at 897 (remand to the agency would prejudice the substantial rights of the party to have its petition

adjudicated within a "reasonable" time period). I also must acknowledge that it is incumbent upon the judicial system to devise a remedy that will do justice in consideration of the significant interests of the parties involved. *See Easton's Point Association, Inc.,* 559 A.2d at 636. This is such a case.

Other jurisdictions also have recognized this principle. *See Middle Rio Grande Conservancy District v. Norton,* 294 F.3d 1220, 1230–31 (10th Cir.2002) ("unique circumstances" including, "massive delays", and significant impact allow for court to order relief); *Sierra Pacific Industries v. Lyng,* 866 F.2d 1099, 1111 (9th Cir.1989) (when reviewing agency decision, court "may adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action") (quoting *Ford Motor Co. v. NLRB,* 305 U.S. 364, 373, 59 S.Ct. 301, 83 L.Ed. 221 (1939)); *N.A.A.C.P. v. Secretary of Housing & Urban Development,* 817 F.2d 149, 160 (1st Cir.1987) ("A court, where it finds unlawful agency behavior, may tailor its remedy to the occasion"); *Greene v. Babbitt,* 943 F.Supp. 1278, 1287–88 (W.D.Wash.1996) (remand not required where court loses confidence in agency ability to render impartial and expeditious decision); *Benten v. Kessler,* 799 F.Supp. 281, 291 (E.D.N.Y. 1992) (if "administrative misuse of procedure has delayed relief," the court is not limited to "mere remand").

In *Greene,* 943 F.Supp. at 1288, the United States District Court for the Western District of Washington stated that, "when agency delays or violations of procedural requirements are so extreme that the court has no confidence in the agency's ability to decide the matter expeditiously and fairly, it is not obligated to remand." Rather, the court "may put an end to the matter by using its equitable powers to fashion an appropriate remedy." *Id.* Furthermore, in *Professional Air Traffic Controllers Organization v. Federal Labor Relations Authority,* 685 F.2d 547, 565 (D.C.Cir.1982) (*PATCO*), the United States Court of Appeals for the District of Columbia Circuit stated that because "the principal concerns of the court are the integrity of the process and the fairness of the result, mechanical rules have little place in a judicial decision whether to vacate a voidable agency proceeding. Instead, any such decision must of necessity be an exercise of equitable discretion."

In this case, the integrity of the administrative process was irrevocably tainted once a commissioner was threatened in an effort to gain support for the Goulet plan. The procedural integrity was even further thwarted when five CRMC members voted to reject the subcommittee recommendation based on *ex parte* evidence. The six year delay from when Champlin's filed its application, along with the troubling events that occurred during the administrative proceeding, demonstrate to me that the decision by the trial justice was a most appropriate and equitable resolution of this matter.

Additionally, I find it difficult, if not impossible, to distinguish the facts of this case from our holding in *Sakonnet,* 536 A.2d at 897. There, the CRMC rejected the petitioner's application to relocate his cottage to a vacant lot without making any findings of fact, a violation of § 42–35–12. *Sakonnet,* 536 A.2d at 896. This Court further stated in *Sakonnet* that an agency decision must be supported by factual findings, its interpretation of the pertinent law, and an application of the law to the facts. *Id.* In a noteworthy decision by this Court, we granted the petitioner's application to relocate his cottage based on his right to have his petition adjudicated within a reasonable time period, when, at

that point, the adjudication process had taken nearly seven years. *Id.*

My colleagues distinguish *Sakonnet* on the grounds that the significance of the petitioner's application to relocate his cottage is of virtually no consequence, compared with the potential environmental impact of Champlin's proposed expansion of its docks, and therefore, the CRMC is best equipped to adjudicate the matter. I do not disagree with the notion that Champlin's proposed expansion is a matter of great magnitude. In fact, it is the very significance of this matter that gives me grave doubts that the CRMC will fairly and expeditiously adjudicate it upon this Court's remand. My concerns are based on the trial justice's findings that five CRMC members chose to support the not-on-the-record Goulet plan rather than re-open the hearings to allow the parties to address it. My doubts are deepened by Chairman Tikoian's threatening actions towards another commission member. My position is not meant to indicate any diminution of my respect for the CRMC, as I recognize the arduous duties that it must perform. In this particular case, however, the trial justice's findings suggest to me that the CRMC has been compromised to such an extreme that it should not adjudicate this matter.

Finally, with respect to my colleagues' implicit, but unstated, belief that the trial justice substituted her own judgment for that of the agency in violation of § 42–35–15(g), I do not see any evidence, whatsoever, that supports that conclusion. In the majority's view, the replacement of the CRMC decision with that of the subcommittee recommendation was un-

lawful because it was not one of the options available to the trial justice. I believe, however, that it was. In my view, as stated *supra,* the trial justice had authority to reverse or modify the CRMC decision once she found that the CRMC decision was based upon an unlawful procedure. Whether the trial justice reversed the CRMC decision by simply granting Champlin's petition outright or modified the CRMC decision by elevating the subcommittee recommendation, she was still well within her authority under § 42–35–15(g).

Moreover, the Superior Court record clearly shows that the trial justice went to great lengths to ensure that the outcome of this matter represented the judgment of the non-biased CRMC members. Instead of simply reversing the CRMC decision once she found that Champlin's rights had been violated, which she was entitled to do, she subtracted the disqualified members' votes based on the concept of judicial discretion that we endorsed in *Birchwood Realty, Inc. v. Grant,* 627 A.2d 827, 834 (R.I.1993) (announcing that trial justice has discretion in fashioning a remedy on agency appeals).[47] This arithmetical remedy resulted in the adoption of the subcommittee recommendation by a vote of four to three.

Although I applaud her ingenuity in devising such a remedy, once the trial justice found that Champlin's substantial rights had been prejudiced by unlawful agency procedure, she simply could have reversed the CRMC without an examination or subtraction of the votes. *See Sakonnet,* 536

---

**47.** Although my colleagues declare that *Birchwood* should be read narrowly to require a trial justice to either "affirm" or "remand" an agency decision on appeal, they disregard the fact that G.L.1956 § 42–35–15(g) explicitly allows for a trial justice to "reverse" or "modi-

fy" when the substantial rights of the party have been prejudiced. *See* § 42–35–15 (providing for Superior Court review of contested agency cases). As stated *infra,* the RIAPA permits a continuation of the administrative process in the Superior Court.

A.2d at 897; *see also Birchwood*, 627 A.2d at 834.

## II

## Remand

## A

## Placing *Ex Parte* Communications on the Record in Compliance with *Arnold*

I disagree with the majority's holding that the trial justice erred when she did not remand the case back to the CRMC after she found that certain members had engaged in *ex parte* communications. Although I agree that *ex parte* communications in administrative proceedings are prohibited by § 42–35–13 and that parties in agency proceedings must be given notice and an opportunity to be heard, I do not believe that our holding in *Arnold*, 941 A.2d at 821, impliedly or otherwise requires that the administrative record must be completed with *ex parte* communications *in every case*.

Here, the trial justice found that the CRMC had not only engaged in *ex parte* communications, but also that it had rendered a decision that was clearly erroneous based on the evidence in the record and that at least two CRMC members had demonstrated bias. Based on these findings, the trial justice had the authority to reverse the CRMC decision under § 42–35–15(g), as discussed *supra*. Because the trial justice had other grounds for reversing the CRMC, separate and apart from the fact that certain members had engaged in *ex parte* communications, it is my opinion that she was not compelled to remand to the CRMC to place those *ex parte* communications on the record.

Once the trial justice reversed the CRMC decision, a remand for the purpose of completing the record with the Goulet plan would only have served to further

delay and prejudice the rights of Champlin's. *See Ratcliffe v. Coastal Resources Management Council*, 584 A.2d 1107, 1111 (R.I.1991) (stating that remand would not serve justice because additional delay would be "intolerable"); *see also Sakonnet*, 536 A.2d at 897. Remand to the CRMC so that the *ex parte* communications (the Goulet plan) could be placed on the record would have been meaningless as the trial justice's reversal of the CRMC decision effectively granted Champlin's application for expansion. *See Macera v. Cerra*, 789 A.2d 890, 894–95 (R.I.2002) (agency remand not required when further fact-finding would serve no useful purpose and cause further delay).

It is my view, therefore, that when a remand to the administrative agency to complete the record with *ex parte* communications would serve no meaningful purpose, it is not required under our holding in *Arnold*.

## B

## This Court's Power to Fashion a More Equitable Remedy

Finally, if reversal of the trial justice were warranted in this case, which I strongly believe it is not, it is my view that this Court should exercise its inherent power to devise a more equitable remedy. Given the length of delay in the adjudication of this matter and the improper conduct that was engaged in by certain CRMC members during the first proceeding, I believe it would be an injustice to instruct the trial justice to remand the matter back to the CRMC to place evidence of the Goulet plan on the record. Given this Court's legal and equitable power to fashion an appropriate remedy, I would instead remand this matter to the trial justice so that she could hold a hearing for the limited purpose of considering

the Goulet plan, and to allow the parties the opportunity to be heard with respect to the plan. *See Moore v. Ballard,* 914 A.2d 487, 489 (R.I.2007) (recognizing this Court has the "inherent power to fashion an appropriate remedy that would serve the ends of justice") (quoting *Vincent v. Musone,* 574 A.2d 1234, 1235 (R.I.1990)).

Once the record has been completed, the trial justice should be the final arbiter on the expansion that Champlin's has proposed because this Court has recognized that such consideration by the Superior Court is a continuation of the administrative process. *See Ratcliffe,* 584 A.2d at 1111 (granting petitioners' application without remand to CRMC based on CRMC's failure to comply with RIAPA and extreme delay); *Sakonnet,* 536 A.2d at 897 (affirming trial justice's remedy to reverse CRMC decision and grant petitioner's application based on improper agency procedure and delay); *see also* § 42–35–15(g).

I believe that in this particular case the trial justice is best suited to render a just and expeditious decision given her extensive knowledge of the administrative and court record. At present, the CRMC consists of three new members who, on remand, would have to read the transcripts of the twenty-three subcommittee hearings held over a period of two years. In addition to that massive undertaking, it is likely that the testimony and cross-examination concerning the Goulet plan could be drawn out for years to come and cause the earlier subcommittee hearings to be reopened, creating further financial burdens on all parties in what has now evolved into a seven-year battle.

With respect to my colleagues' concerns that a remand to the trial justice for consideration of the Goulet plan would deny the interested parties their right to appeal, I would note that those parties *would* have an avenue to review the trial justice's decision through a petition for writ of certiorari to this Court. A remand to the trial justice *would* allow the interested parties and intervenors an opportunity to examine the evidence in support of the Goulet plan, which is, ironically, an opportunity which they were denied during the initial proceeding.[48] In essence, the trial justice would simply be replacing the CRMC for the purposes of considering the Goulet plan. Upon entry of final judgment by the trial justice, the aggrieved party would then, if it so desired, be able to seek review of the trial court's decision to this Court through a petition for writ of certiorari.

In consideration of the patently unfair nature of the initial CRMC proceedings and this Court's power to fashion an appropriate remedy in the interests of justice, the Superior Court would be the proper forum to adjudicate this matter both fairly and expeditiously. I therefore dissent from the majority's decision to reverse the trial justice's decision and the majority's decision to remand the matter back to the CRMC.

Justice GOLDBERG did not participate.

---

48. It is important to note that the Goulet plan was not conceived nor proposed by the parties or the intervenors; rather, it was created and introduced by members of the CRMC after the subcommittee hearings had closed. The CRMC never reopened the hearings so that the parties could have an opportunity to examine the evidence supporting the Goulet plan.