June 30, 2021

Dr. William Kyros          :

v.          :

Rhode Island Department of          :
Health et al.

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email:    opinionanalyst@courts.ri.gov,    of    any typographical  or  other  formal  errors  in  order  that corrections may be made before the opinion is published.

Dr. William Kyros          :

v.                        :

Rhode Island Department of   :
    Health et al.

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Justice Goldberg, for the Court.**   This case came before the Supreme Court on May 18, 2021, pursuant to a writ of certiorari issued following a petition for review filed by the defendants, the Rhode Island Department of Health (DOH) and Nicole Alexander-Scott, M.D., in her capacity as Director of the DOH (collectively defendants).  The defendants seek review of an order and a judgment of the Superior Court reversing a decision and order of the DOH Board of Medical Licensure and Discipline (the Board) that required the plaintiff, William Kyros, M.D. (Dr. Kyros or plaintiff)—who sought to return to the practice of medicine after signing an agreement to cease practice in 2009—to complete a competence assessment program and fitness for duty evaluation for physicians seeking to reenter practice after discipline.  The defendants argue that the trial justice erred:

(1) in reversing the Board's decision because, they contend, competent evidence in the record supported the Board's decision and the sanction imposed was not arbitrary or capricious; and (2) in declining to remand the case to the Board for further proceedings. For the reasons set forth in this opinion, we affirm the judgment and the order of the Superior Court.

## Facts and Travel

The plaintiff has been licensed as a physician in Rhode Island since June 1986. In August 2009 plaintiff and the Board entered into an Agreement to Cease Practice (the Agreement). Apparently, the Board had "received notice that [Dr. Kyros] engaged in unprofessional conduct by engaging in serious professional boundary violations with patients."[1] Based on its investigation, the Board found probable cause to discipline Dr. Kyros. It did not do so, however.

The parties entered into an agreement whereby Dr. Kyros waived his right to a hearing and further procedural steps and agreed that failure to comply with the Agreement would subject him to further disciplinary action. The Agreement provided that Dr. Kyros would

> "cease practicing any branch of medicine[,] * * * go for
> an evaluation at the Sante Center for Healing, * * * [t]he
> evaluation report must be sent directly to the Board[, and

---

[1] The record reveals that, while investigating a complaint of a boundary violation with a female patient that occurred in April 2009, the Board uncovered two additional instances of alleged boundary violations with female patients "dat[ing] back to the early 1990s[.]"

that t]he Board will make a determination on final sanctions after it reviews and considers the evaluation report from [the] Sante Center for Healing."

Doctor Kyros attended the Santé Center in Argyle, Texas, from August 17 through 20, 2009. A fifty-four-page comprehensive report was compiled by the Santé Center and received by the Board on September 25, 2009 (the report). The report detailed plaintiff's personal history, evaluations by several health-care professionals, the results of two polygraph examinations, and a preliminary recommendation. The Santé Center recommended that "Dr. Kyros should not return to the unrestricted practice of medicine through direct psychiatric patient care" and that, at the appropriate time, he should return to supervised practice. The report also recommended that Dr. Kyros successfully complete an education course about maintaining proper boundaries. Significantly, the issue of Dr. Kyros' "skill and competence in the practice of medicine" was explicitly not addressed by the Santé Center because it was beyond the scope of the assessment and within the province of the Board and DOH.

Doctor Kyros was willing to do everything he reasonably could in order to comply with the recommendations of the Santé Center and address the concerns raised in the report. The record supports this contention. He promptly contacted the Board, asking for guidance on what should be his next steps. Doctor Kyros received no response. In November 2009, Dr. Kyros, proactively and of his own

accord, began treating with Edward Brown, M.D., and Gene Jacobs, O.D., both of whom are psychiatrists. In accordance with the recommendation in the report, Dr. Kyros completed a course in Medical Ethics, Boundaries & Professionalism in September 2010. Time passed.

On June 10, 2013, Dr. Kyros contacted the Board "to discuss his future." Enclosed was a report from Dr. Jacobs, which detailed his treatment and diagnosis of Dr. Kyros. Doctor Jacobs stated, "After working with Dr. Kyros these past 3.5 years I saw no evidence of any characterological traits or patterns consistent with or evidencing a propensity or likelihood of Dr. Kyros exhibiting boundary issues." Doctor Jacobs concluded that there was no further need for Dr. Kyros to engage in psychiatric follow-up care, and he saw "no reason as to why Dr. Kyros cannot restart clinical practice."

Doctor Kyros met with the chief administrative officer of the Board, James McDonald, M.D., and was directed to engage with the chairperson of the Physicians Health Committee of the Rhode Island Medical Society, an agency not affiliated with DOH. Doctor Kyros complied; in August 2013, he was told by Chairperson Herbert Rakatansky, M.D., that he must undergo a forensic psychiatric evaluation. He did so. On August 19, 2013, Daniel Harrop, M.D., submitted a report of his forensic evaluation of Dr. Kyros to Chairperson Rakatansky. Doctor Harrop concluded that Dr. Kyros was fit for duty to have his

license returned unrestricted. Chairperson Rakatansky contacted Dr. McDonald on September 9, 2013, notifying him that Dr. Kyros had met with him, provided supporting documents, and submitted to a forensic psychiatric evaluation. Chairperson Rakatansky noted that he had "no reason to doubt" the favorable conclusions reached by Dr. Jacobs and Dr. Harrop "that Dr. Kyros is no longer impaired medically or psychologically[.]"

Three months later, on December 4, 2013, Dr. Kyros was formally issued a preliminary finding of "Unprofessional Conduct" by an investigating committee of the Board. Doctor Kyros met informally with Dr. McDonald in January 2014 to discuss a potential resolution to the charge of unprofessional conduct. The parties were unable to reach an agreement because Dr. Kyros was opposed to supervision and probation. Doctor Kyros testified that he was unable to pursue a formal hearing in 2014 due to financial circumstances. For nearly two years thereafter, Dr. Kyros retained new counsel and engaged in discovery to prepare for what he believed would be an eventual hearing before the Board. The parties continued to meet several times to discuss settlement but were again stonewalled by the issue of supervision and probation. Doctor Harrop submitted an updated report to the Board in November 2015 and affirmed his earlier conclusion—that Dr. Kyros was fit for duty, that an unrestricted license could be reinstated, and that Dr. Kyros could resume practice.

Negotiations over a consent order continued through Fall 2016. To no avail. Finally, in March 2017, Dr. Kyros demanded a formal hearing before the Board "regarding his fitness to return to the practice of medicine as contemplated in the" Agreement. Doctor Kyros also submitted a "Reinstatement Application" to the Board. The Board found his application to be incomplete, and Dr. Kyros resubmitted the application in April 2017 and included proof that he had completed four years of continuing medical education credits, from 2013 through 2017.

Doctor Kyros met with the licensing committee of the Board on August 3, 2017; due to "the complexity of [his] application[,]" the matter was tabled until September 7, 2017, when the committee voted to require Dr. Kyros to "attend the Sant[é] Center for a re-evaluation since so much time has elapsed since the original evaluation." The licensing committee also required him "to attend the Center for Personalized Education for Physicians (CPEP) to assess [his] clinical competency to practice psychiatry." The committee indicated that once both evaluations were complete, they would again reassess the application.

Yet another demand for a formal hearing was made by Dr. Kyros on September 18, 2017. Doctor McDonald confirmed receipt of the demand letter and invited Dr. Kyros to again appear before the licensing committee. Doctor Kyros declined to re-appear and indicated his reluctance to attend the Santé Center and CPEP because he felt it was unnecessary given the extensive treatment he had

undergone. The committee denied Dr. Kyros' application for licensure on October 10, 2017, and Dr. Kyros timely demanded a formal hearing.

The specification of charges by the Board is the focal point of our analysis and determinative of our holding. A one-count specification of charges was issued against Dr. Kyros in November 2017, alleging that he engaged in unprofessional conduct—in violation of G.L. 1956 § 5-37-5.1—by violating provisions of chapter 37 of title 5 of the general laws, or the rules and regulations of the Board or the director, or the provisions of an agreement of the Board. A hearing committee of the Board conducted an evidentiary hearing on December 7, 2017, and January 31 and May 17, 2018, including the presentation of documentary and testimonial evidence. The Board issued a ten-page written decision and order dated November 14, 2018, which made four findings of fact. There was no finding that Dr. Kyros engaged in "unprofessional conduct." Doctor Kyros was ordered to complete a competence assessment program and fitness for duty evaluation at CPEP for physicians seeking to re-enter practice *after discipline*, to follow all recommendations from CPEP, and satisfy all statutory requirements for licensing.[2] The director adopted the decision and order of the Board, and Dr. Kyros filed a timely notice of appeal to the Superior Court.

---

[2] Doctor Kyros was also required to pay for certain costs and expenses arising out of the administrative proceedings. Before the Superior Court, defendants conceded that the imposition of administrative fees was improper. That issue is not before the Court.

Before the Superior Court, Dr. Kyros alleged the usual grounds for an administrative appeal: He argued that the decision was (1) in violation of constitutional, statutory, or ordinance provisions; (2) in excess of the Board's and DOH's authority; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous; and (6) arbitrary or capricious or characterized by abuse of discretion. Specifically, Dr. Kyros asserted in support of his administrative appeal that the Board's order that Dr. Kyros attend CPEP was "disproportionately harsh when compared to the sanctions propounded upon other similarly situated physicians[,]" and "unsupported by factual findings in the Board's [d]ecision." Doctor Kyros also argued that the length of time it took for the Board to determine final sanctions and a path forward was arbitrary and capricious.

The defendants argued that the Board's decision to require Dr. Kyros to complete CPEP should be upheld because Dr. Kyros "has not proffered any proof of his clinical competence to practice medicine[,]" and has "not seen a patient since 2009[.]" The Board also maintained that any delay in Dr. Kyros' return to the practice of medicine was of his own accord because he refused multiple opportunities to return to practice with supervision and probation.

The trial justice entertained argument on September 18, 2019; on December 13, 2019, he issued a written decision granting the appeal and reversing the Board's decision. The trial justice found that "the Board relie[d] solely on Dr.

Kyros' nine-year gap in practicing medicine—a gap that the Board is largely responsible for—to justify requiring clinical competency courses." Referencing the Board's Superior Court filing in opposition to Dr. Kyros' administrative appeal, the trial justice noted that "[t]he Board arbitrarily believes this gap speaks for itself" but that, in actuality, the record was "devoid of nearly any evidence that Dr. Kyros is not clinically competent." The trial justice recognized that the only evidence of Dr. Kyros' clinical competence was from Drs. Brown, Jacobs, and Harrop, all of whom determined that Dr. Kyros was fit to return to the practice of medicine, and the undisputed fact that Dr. Kyros had completed all continuing medical education credits.

The trial justice expressed his concern "about the extensive license deprivation" created by the Board "where Dr. Kyros was unable to understand and fulfill what [the Board] wanted for over nine years." The trial justice found that Dr. Kyros *never* surrendered his medical license, but rather agreed to cease practice pursuant to the Agreement; the doctor "was only forced to apply for relicensure to get the Board to come to a conclusion when it repeatedly remained silent regarding Dr. Kyros's efforts to return to practice." The trial justice correctly concluded that "there has been no finding by the Board of unprofessional conduct[,] * * * there was no competent evidence to support a finding requiring

Dr. Kyros to attend CPEP classes to address his clinical competency[,] * * * [and] the imposition of that penalty was arbitrary and capricious."

Accordingly, the Superior Court reversed the decision of the Board and stated that

> "[a]lthough the [c]ourt would typically be inclined to remand this case to RIDOH for further proceedings—with respect to inadequate findings of fact—here, the [c]ourt finds that doing so would only cause more harm and opportunity for delay after a nearly decade-long saga, and moreover, the Board [d]ecision was not supported by competent evidence."

Final judgment entered in favor of plaintiff. This Court granted defendants' petition for writ of certiorari on April 24, 2020, and a writ issued on April 29, 2020.[3]

## Standard of Review

The Superior Court's review of an administrative decision is governed by the Administrative Procedures Act, G.L. 1956 chapter 35 of title 42.[4] "[T]he

---

[3] We also granted defendants' emergency motion to stay enforcement of the trial justice's decision pending our consideration of the writ of certiorari.

[4] General Laws 1956 § 42-35-15(g) provides:

> "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the

- 10 -

Superior Court must uphold the agency's decision if it is supported by legally competent evidence." *Endoscopy Associates, Inc. v. Rhode Island Department of Health*, 183 A.3d 528, 532 (R.I. 2018). "When this Court reviews the Superior Court's decision on certiorari, we apply the 'some' or 'any' evidence test and review the record to determine whether legally competent evidence exists to support the findings.'" *Id.* (brackets omitted) (quoting *Sartor v. Coastal Resources Management Council*, 542 A.2d 1077, 1083 (R.I. 1988)). This Court will "not weigh the evidence, but rather determine whether the trial justice was legally justified in modifying or reversing the agency's order." *Id.* (quoting *Interstate Navigation Co. v. Division of Public Utilities and Carriers*, 824 A.2d 1282, 1286 (R.I. 2003)). We also examine the record for any errors of law. *Id.*

---

administrative findings, inferences, conclusions, or decisions are:
"(1) In violation of constitutional or statutory provisions;
"(2) In excess of the statutory authority of the agency;
"(3) Made upon unlawful procedure;
"(4) Affected by other error of law;
"(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
"(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."

## Analysis

Before this Court, defendants assert two claims of error. The defendants first argue that the trial justice erred in finding that the Board's decision was arbitrary, capricious, and not supported by competence evidence. Specifically, defendants contend that the CPEP requirement was made pursuant to the Agreement—which authorized the Board to take into consideration the Santé Center Report and make a final determination on sanctions—and the Board's decision noted that Dr. Kyros had not seen a patient since 2009, thereby supporting this sanction. The defendants are mistaken.

The specification of charges issued against Dr. Kyros is the controlling document in this case, and it alleges that Dr. Kyros violated § 5-37-5.1. This section of our general laws is entitled "Unprofessional conduct" and enumerates thirty-one items that may constitute unprofessional physician conduct. The Board specifically charged Dr. Kyros with violating § 5-37-5.1(24), which qualifies unprofessional conduct as "[v]iolating any provision * * * of this chapter or the rules and regulations of the board or any rules or regulations promulgated by the director or of an action, stipulation, or agreement of the board[.]" This charge was not sustained. Doctor Kyros was not found to have engaged in unprofessional conduct, and no disciplinary sanction was imposed. The Board did not address it.

The Board's decision overlooked, and indeed ignored, the specification of charges and declared that the issue before it was *not* whether Dr. Kyros "engaged in unprofessional conduct by violating a Board order and if so, what discipline should be imposed, *but rather * * ** whether because of previous complaints of unprofessional conduct that resulted in the Agreement should [Dr. Kyros] be allowed to be re-licensed in light of the requirements in the Agreement." (Emphasis added.) This was a marked departure from the specification of charges and was made upon unlawful procedure. The trial justice was correct in concluding that the Board never made a finding that Dr. Kyros was guilty of unprofessional conduct.

The Board made no finding that Dr. Kyros violated the terms of the Agreement and, importantly, the record is devoid of any evidence that he did so. Both sides were bound by the terms of the Agreement. It is not a flexible concept. The record before us establishes that Dr. Kyros attempted to fulfill all of his obligations under the Agreement, including attending the Santé Center, complying with the recommendations in the report, treating with psychiatrists, and completing a course in proper boundaries and professionalism. He sought guidance from the Board on numerous occasions as to his next steps; and, if he received a response from the Board, he followed through with their instructions, including engaging with the Physicians Health Committee of the Rhode Island Medical Society and

submitting to a forensic psychiatric evaluation, all at his expense. He also completed all continuing medical education credits from 2013 through 2017. Despite Dr. Kyros' unflagging efforts to comply with the terms of the Agreement and satisfy all requests made by defendants, the Board—for nine years—neglected *its* obligation under the Agreement to "make a determination on final sanctions" and ultimately imposed none. The Board made no findings about Dr. Kyros' clinical competency and there is no credible evidence to support its order for a competence assessment program and fitness for duty evaluation for practitioners seeking to reenter practice after discipline.

The trial justice found that the record was devoid of any evidence that Dr. Kyros was not clinically competent to practice medicine. In the face of this finding, a remand would be futile. Although the Board acknowledged in its decision that pursuant to "the Agreement, the Board is to take into consideration the Sant[é] Center's Report when determining any licensing and discipline issues[,]" it overlooked and misconceived the provision in the report that "[t]he issue of skill and competence in the practice of medicine is beyond the scope of this assessment and will not be addressed here." Accordingly, any reliance by defendants on the report to uphold the Board's decision is misplaced and was

properly rejected by the trial justice.[5]  The issue of skill and competence was textually committed to the DOH, and DOH failed to present any evidence and made no findings.

The only competent evidence in the record of Dr. Kyros' fitness for clinical practice is the positive reports from three respected medical practitioners, Drs. Brown, Jacobs, and Harrop, as well as the evidence that he completed all continuing medical education credits.  In their reports, the physicians each reached the same conclusion: Doctor Kyros was fit to have his license reinstated and return to clinical practice.  The Board erroneously concluded:

> "Pursuant to the Agreement * * * the Committee unanimously found that in order to be re-licensed, [Dr. Kyros] shall ensure competency by satisfactorily completing the fitness for duty and clinical competency assessment at CPEP and by following all recommendations from CPEP.  [Doctor Kyros] shall keep

---

[5] Notwithstanding the lack of relevance of the report to the issue of Dr. Kyros' clinical competency, we note our concern about the fact that two polygraph examinations were employed to support the conclusion that Dr. Kyros should not return to the unrestricted practice of medicine because he was not "fully truthful [or] is in denial about his own actions or contributions to the situations that led to his past and current complaints."  This Court has "conclud[ed] that the 'test results of polygraph examinations have not been established as scientifically reliable.'" *State v. Werner*, 851 A.2d 1093, 1103 (R.I. 2004) (quoting *State v. Dery*, 545 A.2d 1014, 1017 (R.I. 1988)).  We have "determined that polygraph examinations are unreliable and that no evidence exist[s] tying deceit and lying to the physiological reactions measured by a polygraph examination." *Id.*  Accordingly, polygraph evidence is categorically excluded under our jurisprudence. *Id.*  Because a polygraph examination is not an accepted investigatory tool, its inclusion in the report is unsettling.

the Board informed of his progress at CPEP on an ongoing basis."

The Board's reliance on the Agreement to support these findings is clearly erroneous. The Agreement is silent on the question of clinical competency. The Board failed to make a single finding that Dr. Kyros was, in fact, not clinically competent, and wholly overlooked the substantial evidence in the record that plaintiff was fit for clinical practice.

Although the Board argued to the trial justice that Dr. Kyros' "lapse of more than nine years speaks for itself relative to the question of clinical competence," this blanket assertion is of no moment to the issue before us and ignores the reliable and probative evidence in the record. Furthermore, this argument is belied by the fact that the Board specifically limited Dr. Kyros to the programs for physicians who have been disciplined.[6]

Pursuant to § 5-37-6.2, the Board is required to "prepare written findings of fact and law" to support its conclusions and decision. If the Board fails to adequately do so, then the Superior Court may, pursuant to § 42-35-15(g), find the decision erroneous and unsupported by evidence, or arbitrary or capricious. *See*

---

[6] The Board's decision specifically directed Dr. Kyros to complete CPEP's clinical competency assessment. The Board acknowledged that this program is reserved for "[t]hose seeking to reenter practice after discipline[,]" and the decision stated that Dr. Kyros was *not* to complete the reentry to clinical program at CPEP. Thus, the sanction imposed by the Board was clearly a disciplinary sanction. A necessary predicate to discipline was a finding by the Board that he was guilty of unprofessional conduct. There is no such finding.

*Sakonnet Rogers, Inc. v. Coastal Resources Management Council*, 536 A.2d 893, 896 (R.I. 1988) ("An administrative decision that fails to include findings of fact required by statute cannot be upheld."). In this case, the Board wholly failed to make findings of fact that supported its conclusion that Dr. Kyros needed to attend postdiscipline CPEP programs to assess his clinical competency. Instead, the Board attempted to support the CPEP requirement—which apparently could cost approximately $28,000—by arguing that the necessity of the program spoke for itself. The Superior Court properly recognized these deficiencies and reversed the decision.

The defendants also submit that the trial justice erred in declining to remand the case to the Board for further proceedings because the protection of the health and safety of the public "outweigh[s] concern for prejudice of [Dr. Kyros'] right to a final adjudication within a reasonable period." We disagree with this contention. Parties who are subject to administrative proceedings have the right to an expeditious agency decision and judicial decision. Only the trial justice complied with this mandate; the DOH did not. Indeed, this Court has "acknowledge[d] that there are instances in which a remand to an administrative agency may not be the most appropriate remedy[,]" including those cases in which a remand would not "'further the interests of justice * * * [or] provide decisive new information.'" *Champlin's Realty Associates v. Tikoian*, 989 A.2d 427, 449 (R.I. 2010) (quoting

*Easton's Point Association, Inc. v. Coastal Resources Management Council*, 559 A.2d 633, 636 (R.I. 1989)).

Doctor Kyros voluntarily ceased practicing medicine for more than nine years. It is striking that defendants would now claim that this matter should be further delayed in order to afford them an opportunity to attempt to correct the deficiency of the Board's decision which did not comply with the specification of charges. Allowing defendants to continue to stonewall Dr. Kyros' return to the practice of medicine will not further the interests of justice.[7]

Moreover, remanding the matter to the Board would not produce new information that could cure the deficiency of the Board's decision. As we have already concluded, there is no evidentiary support in the record that Dr. Kyros is not clinically competent. The passage of time does not speak to anything in light of all that Dr. Kyros has done in furtherance of the Agreement. It is not for us to hold otherwise. Accordingly, we discern no error with the trial justice's decision reversing the Board's decision and declining to remand for further proceedings.

---

[7] We acknowledge that, at times, delay in the resolution of this matter may have been caused by Dr. Kyros' financial situation, his desire to retain new counsel, and/or tactical decisions made by counsel. However, Dr. Kyros' actions in no way relieved the Board of its responsibilities pursuant to the Agreement to determine final sanctions.

## Conclusion

The judgment of the Superior Court is affirmed. The papers may be remanded to the Superior Court with our decision endorsed thereon.


**Justice Robinson, dissenting.** I respectfully but vigorously dissent from the majority's opinion in this important and vexing case. I never lightly dissent, but I am unequivocally convinced that I must do so forcefully in this case. In my opinion, the hearing justice erred when he reversed the decision of the Rhode Island Department of Health's Board of Medical Licensure and Discipline (the Board), which had required that, in order to be re-licensed, William Kyros, M.D., must "satisfactorily complet[e] the fitness for duty and clinical competency assessment at [the Center for Personalized Education for Physicians (CPEP)] and * * * follow[ ] all recommendations from CPEP."

I acknowledge at the outset, as I must, that our standard of review in the context of a case which comes to this Court by way of a writ of certiorari is deferential: we do not weigh the evidence but rather review "the record as a whole to determine whether any legally competent evidence[1] exists therein to support

---

[1] "Legally competent evidence (sometimes referred to as 'substantial evidence') has been defined as relevant evidence that a reasonable mind might accept as adequate to support a conclusion[; it] means an amount more than a scintilla but less than a preponderance." *Town of Burrillville v. Rhode Island State*

the trial court's decision or whether the trial court committed [an] error of law in reaching its decision." *Banki v. Fine*, 224 A.3d 88, 94 (R.I. 2020) (internal quotation marks omitted); *see also Preservation Society of Newport County v. City Council of City of Newport*, 155 A.3d 688, 692 (R.I. 2017) ("If legally competent evidence exists to support [the] determination [at issue], [this Court] will affirm it unless one or more errors of law have so infected the validity of the proceedings as to warrant reversal.") (internal quotation marks omitted). It is my position that the hearing justice in this case clearly committed errors of law in reversing the decision of the Board.

The basis of my disagreement with the majority is twofold. First, I am of the opinion that the hearing justice clearly erred as a matter of law in this case in failing to recognize that the "Agreement to Cease Practice" (the Agreement), which Dr. Kyros and the Director of Health (on behalf of the Department of Health) signed in 2009, controls this case. Second, in my judgment, the hearing justice also erred in failing to recognize the Board's explicit statutory authority to see to it that the public is properly protected when the Board is dealing with a doctor who, as of the time of the Board's decision, had not practiced medicine in approximately nine years.

*Labor Relations Board*, 921 A.2d 113, 118 (R.I. 2007) (internal quotation marks omitted).

This dispute began when the Board received "notice that [Dr. Kyros] engaged in unprofessional conduct by engaging in serious professional boundary violations with patients." An Investigating Committee of the Board then "found probable cause for discipline." In response to that finding, Dr. Kyros and the Board entered into the Agreement "for settlement purposes * * *." The Agreement explicitly set forth the following pertinent facts: (1) the Board had "received information concerning three boundary violations with women who were [Dr. Kyros's] patients" dating from the early 1990s to 2009; and (2) "[t]he complaints to the Board implicate[d] the provisions of R.I.G.L.5-37-5.1 (30) for sexual contact between a doctor and a patient."

The Agreement further provided that Dr. Kyros was waiving a number of rights, including his right to appear personally or by counsel (or both) before the Board; his right to further procedural steps (except for those specifically contained in the Agreement); and "[a]ny and all" of his rights to appeal the Agreement.[2] The Agreement reflected Dr. Kyros's explicit assent to complying with the following requirements: (1) cease practicing; and (2) attend the Santé Center for Healing for

---

[2] In my opinion, Dr. Kyros's waiver of these rights in the Agreement, which expressly stated that it was entered into "for settlement purposes," is the reason the allegations against him did not progress to a determination by the Board as to whether or not he had engaged in unprofessional conduct. Doctor Kyros chose to settle as opposed to availing himself of the further procedural steps before the Board (and an appeal to Superior Court), to which he would otherwise have been entitled.

an evaluation. It further provided that the Board would "make a determination on final sanctions after it reviews and considers the evaluation report from [the] Sante Center for Healing." It is significant that Dr. Kyros's signature appears at the end of the Agreement.[3]

A contract, like the Agreement at issue in this case, is binding on the signatories to the contract. *See Lamoureux v. Burrillville Racing Association*, 91 R.I. 94, 98, 161 A.2d 213, 215 (1960) ("A contract is an agreement which creates an obligation.") (quoting 17 C.J.S. *Contracts* § 1 at 310); 17A Am. Jur. 2d *Contracts* § 1 (May 2021 Update) ("A 'contract' is an agreement between two or more parties that creates obligations that are legally enforceable by the contracting parties."); *see also Manchester v. Pereira*, 926 A.2d 1005, 1012 (R.I. 2007) ("[I]t has long been a settled principle that a party who signs an instrument manifests his assent to it and cannot later complain that he did not read the instrument or that he did not understand its contents.") (internal quotation marks omitted). Thus, Dr. Kyros is bound by his agreement to allow the Board to make a determination of final sanctions after it reviewed the Santé Center evaluation. After carefully poring over the record, it is my opinion that that is what the Board has actually done in this case. The Board has surely not acted with maximal celerity and clarity, but it has nonetheless done what it contractually bound itself to do when the critically

---

[3] I further note that it is clear from the record that Dr. Kyros was represented by counsel at the time he entered into the Agreement.

important Agreement was signed by both parties in the wake of the Board's having "received information concerning three boundary violations with women * * *."

I readily acknowledge that the Board's ultimate decision was issued years after the signing of the Agreement. At the same time, however, it is noteworthy that the Agreement did not contain any timeline provision. Additionally, I would note that, while the Board is not blameless with respect to the delay in this case, it is clear from the record that a meaningful portion of the delay was the result of negotiations between the Board and Dr. Kyros with respect to his possible return to practice and the conditions that might be attached thereto. The record reflects that those negotiations were unsuccessful at least in part due to Dr. Kyros's resistance to supervised practice. Because, in my judgment, the Agreement which Dr. Kyros opted to enter into allows for the Board to determine final sanctions, as it has now done, it was error on the part of the hearing justice to reverse the Board's decision.[4] Doctor Kyros voluntarily chose to settle by entering into a contractual agreement with the Board. It is my unblinking view that he must now live with the binding legal effect of that choice.

---

[4]    I would note that the Board's decision in this case specifically stated that the issue before it was whether Dr. Kyros should be relicensed "in light of the requirements in the Agreement." The fact that the specification of charges (on which the majority so heavily relies) stated something different does not alter my conclusion about the authority that the Board had to act as it did under the Agreement.

That being said, it is separately my opinion that the Board had competent evidence to support its decision given the fact that Dr. Kyros has, as of now, not practiced medicine for *approximately twelve years*. The Department of Health is specifically charged, by statute, with taking "cognizance of the interests of life and health among the peoples of the state * * *." General Laws 1956 § 23-1-1. The Board, and in turn both the Superior Court and this Court, owe a solemn duty to the public to ensure that medical professionals who are licensed to practice medicine in this state are at least minimally competent. Twelve years away from any profession would in all likelihood affect one's competency and skill. In the field of medicine particularly, twelve years might well be the metaphorical equivalent of an eternity when one considers the rate of medical advancements in the modern world. The Board was well within its authority with respect to its role in licensing physicians and its duty to the public when it required Dr. Kyros to attend CPEP so that there might be assurances of his clinical competency after what was then an approximately nine-year hiatus from practice. In my view (which is contrary to that of the hearing justice), that fact alone serves to show that the Board's decision was not arbitrary and capricious; I submit that the hearing justice erred in finding it to be so.[5]

_____

[5] I note that, in my opinion, it is relevant that the report from the Santé Center explicitly deferred the issue of competency to the Board. Moreover, I would note that my view in this case is not altered by the fact that the CPEP programs which

- 24 -

In addition, I wish to direct attention to the following language from the Rhode Island Code of Regulations pertaining to the Department of Health:

> "Granting of licensure after a lapse for non-disciplinary reasons. If a physician has not engaged in the active practice of medicine for two (2) years or more the Board shall establish clinical competency of the applicant prior to reactivation or reinstatement. The Board may establish clinical competency based on any or all of the following:
>
> "* * *
> "3. An evaluation of clinical competency by a Board approved organization, such as the Center for Personalized Education for Physicians (CPEP). The applicant is responsible to report the results of an evaluation from a Board approved organization and follow the recommendations for ongoing competence * * *." 216 RICR 40-05-1.5(E).

Although I acknowledge that, because of its date of enactment, this regulation as such is not applicable to this case, it is at least evidence of the fact that, even in cases where an absence from practice was for non-disciplinary reasons and has lasted only two years (as opposed to the approximately twelve years at issue in this case), the Board may now require that the physician attend CPEP, just as it has done here.

I am convinced that the Board, in requiring Dr. Kyros to attend CPEP, was well within its authority and, frankly, was acting in a laudably responsible manner,

---

the Board directed Dr. Kyros to complete were apparently programs to be completed after discipline; what matters is that the Board was seeking to assure itself of Dr. Kyros's *present* competence to serve as a medical doctor in this state.

acting pursuant to its statutory duty to protect the public.[6] It seems to me that all

responsible citizens should be very concerned about the potentially harmful effect

on unwitting members of the public of the ministrations of a doctor who has not

practiced medicine in approximately twelve years and who, as a result of the

decision of the majority, will not be required to do *anything* to prove that he

remains competent to practice.[7] To me, the potential threat to the "life and health

---

[6]      The appropriateness of the Board's action vis-à-vis Dr. Kyros in this case is in my view one whose necessity is self-evident. To my mind, the Board acted in a manner that was entirely consistent with common sense. *See Peak v. United States*, 353 U.S. 43, 46 (1957) ("That seems to us to be the common sense of the matter; and common sense often makes good law.").

[7]      The majority relies on the positive reports of Edward M. Brown, M.D., Gene Jacobs, D.O., and Daniel S. Harrop, M.D., and the fact that Dr. Kyros completed all of his continuing medical education credits as evidence of clinical competency. I strongly disagree that those reports and credits are genuinely instructive as to the issue of clinical competency.

     I note initially that Dr. Brown's report (which is surely not entirely positive) dates back to 2010, and both Dr. Jacobs's report and Dr. Harrop's initial report date back to 2013, thus *eight* years and *five* years respectively before the Board's decision at issue in this case. Indeed, Dr. Harrop's updated report was from 2015, some *three* years prior to the Board's decision at issue in this case. But, more importantly, after reading these reports, it is clear to me that they reflect a focus on Dr. Kyros's mental health and whether his mental health was such that it would permit him to responsibly practice in view of the complaints about him stemming from allegations concerning "sexual contact between the doctor and a patient" that gave rise to this case. Those reports *do not* discuss Dr. Kyros's clinical competency. Additionally, I do not believe that continuing medical education credits are indicative of clinical competency in this particular case, given the lengthy period of time during which Dr. Kyros has been away from the practice of medicine.

[of] the peoples of the state" should trump any other consideration.    Section 23-1-1.

Accordingly, for the reasons set forth herein, I respectfully assign error to the hearing justice because, in my judgment, he erred as a matter of contract law and also with respect to the import of the Board's statutory charge to protect the public when licensing physicians.

I do not question the sincerity of the disapprobation of the regrettable lassitude of the Board in dealing with the case of Dr. Kyros that has resulted in the position taken by the majority—although I hasten to add that Dr. Kyros too lives in a glass house with respect to the enormous delays that are reflected in the record. In the end, however, bearing in mind the crucial role of the Department of Health vis-à-vis the citizenry, I very respectfully question whether the decision of the majority comports with what real justice requires in this so very troubling case. In the same tone of respectfulness, but also with ardent conviction, I conclude by remarking that I have never forgotten the observation of the late Justice Thomas Kelleher to the effect that "the attainment of justice * * * is the true purpose of a court's existence." *Wilkinson v. Harrington*, 104 R.I. 224, 230, 243 A.2d 745, 749 (1968).[8]

---

[8] I certainly do not for a moment mean to imply that my respected colleagues ever fail to pursue justice. However, I am profoundly aware that what is "just" can be the subject of good-faith debate. It is my humble opinion that the Court's

Therefore, I record my respectful but wholehearted dissent in this case.

---

opinion in this case does not attain justice, but I do not question the sincerity of those who view the issue differently.



## STATE OF RHODE ISLAND

### SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Dr. William Kyros. v. Rhode Island Department of Health et al. |
| **Case Number** | No. 2020-104-M.P.<br>(PC 18-8998) |
| **Date Opinion Filed** | June 30, 2021 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Maureen McKenna Goldberg |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Jeffrey A. Lanphear |
| **Attorney(s) on Appeal** | For Plaintiff:<br><br>Andrew G. Blais, Esq.<br>Jackson C. Parmenter, Esq. |
| | For Defendants:<br><br>Morgan A. Goulet, Esq.<br>Bruce D. Todesco, Esq. |